[Crim. No. 3886. Fifth Dist. June 24, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
EDDIE MEDINA, Defendant and Appellant.

**COUNSEL**

John V. Giardinelli, under appointment by the Court of Appeal, and Stella A. Ruiz for Defendant and Appellant.

George Deukmejian, Attorney General, Jack R. Winkler, Robert H. Philibosian, Chief Assistant Attorneys General, Arnold O. Overoye, As-

sistant Attorney General, Gregory W. Baugher and James Ching, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BROWN (G. A.), P. J.**—Eddie Medina was convicted of taking and driving a vehicle without the consent of the owner (Veh. Code, § 10851). He appeals.

FACTS

On Friday, February 25, 1977, appellant went to the Kingston-Olds auto dealership (Kingston-Olds). He took an orange 1976 GMC pickup truck for a test drive. The salesperson went with him. On February 26, 1977, appellant returned to the dealership and again drove the same vehicle. He went alone that time and had the vehicle about an hour and a half. Appellant's vehicle, a Ford Ranchero, was left at the dealership. Appellant also drove the truck on Sunday, February 27, 1977. Appellant again left his vehicle at the dealership and drove alone for about one and one-half hours.

An application for credit, a motor vehicle purchase order and a motor vehicle security agreement were filled out by appellant and a salesperson at the dealership. The papers were turned in to a bank, but the application for credit was denied.

On Monday, February 28, 1977, the salesperson contacted appellant and informed him the bank had denied the credit application. Appellant informed the salesperson that he had made arrangements to get the money to purchase the truck from his credit union. Appellant told the salesperson his credit union was in Bakersfield.

At approximately 10 or 11 in the morning appellant left the dealership. Appellant was given permission to take the truck to Bakersfield (for about four hours) so it could be inspected. The truck was used. Appellant was not told the dealership would finance the sale.

Appellant did not return with the truck. At about 6 p.m. on February 28 attempts were made to telephone appellant's home. His alleged boss

was contacted and Mr. Green, the salesperson who was handling the transaction, and others drove by appellant's home. The next time Mr. Green saw appellant was at the pretrial conference.

Mr. Green left the employ of Kingston-Olds in June of 1977. At the time he left the truck still had not been returned.

Frank Ormonde was the owner of Kingston-Olds in February 1977. He and Mr. Green were the only witnesses. Appellant did not testify. Ormonde testified that the purchase order operates as the contract of sale, which binds the dealership to sell a vehicle. The purchase order was never executed. The credit application and motor vehicle security agreement are documents relating to bank-dealer and bank-customer relations. The sales manager of the dealership is authorized to sign contracts and bind the dealership to a sale. The sales manager did sign the motor vehicle security agreement. However, a deal binding the dealership is not made until the purchase order is signed.[1]

Mr. Ormonde and Mr. Green both testified that a sale of the truck to appellant did not occur.

Kingston-Olds got the pickup truck back in June or July of 1977. Mr. Green made numerous attempts to find and contact appellant after appellant did not return with the pickup truck. All of the efforts were unsuccessful.

On April 20, 1977, the police were called and a complaint was filed. Mr. Ormonde finally happened onto appellant in June and demanded the truck be returned. He was told by appellant that he (appellant) "would burn it first." Appellant's attorney arranged for the vehicle to be returned, and it was returned seven to ten days later.

In May, Kingston-Olds received a payment by check from appellant. The check was never cashed.

### DISCUSSION

 Appellant was tried twice. In the first trial the judge declared a mistrial and discharged the jury. Appellant argues that there was no le-

---

[1]The security agreement and purchase order referred to were admitted into evidence.

gal necessity for declaring a mistrial in the first proceeding and that the judge abused his discretion in doing so; he concludes that he was placed twice in jeopardy and his conviction cannot stand. We agree.

The law is summarized by the Supreme Court in *People* v. *Rojas* (1975) 15 Cal.3d 540, 545-546 [125 Cal.Rptr. 357, 542 P.2d 229, 92 A.L.R.3d 1127]: "Under article I, section 13, of the California Constitution and Penal Code section 1023, the discharge of a duly impaneled and sworn jury without a verdict bars a retrial unless the defendant consented to the discharge or legal necessity required it under Penal Code section 1140. [Citation.] Penal Code section 1140 provides: 'Except as provided by law, the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court, unless by consent of both parties, entered upon the minutes, or unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree.'

"... [J]eopardy would attach unless there was legal necessity for the discharge. Such a legal necessity exists if, at the conclusion of such time as the court deems proper, it satisfactorily appears to the court that there is no reasonable probability that the jury can resolve its differences and render a verdict. Under these circumstances the court may properly discharge the jury and reset for trial. [Citations.] The determination, in each instance, rests in the sound discretion of the trial judge, exercisable on reference to and consideration of all the factors before him. [Citations.]"

The exercise of discretion by the trial court will not be interfered with on appeal unless under all the circumstances there has been an abuse thereof. (*In re Chapman* (1976) 64 Cal.App.3d 806, 815 [134 Cal.Rptr. 760].)

The first trial lasted a total of approximately four and a half hours up to the time the jury commenced its deliberations. This included impaneling the jury, opening statements, presentation of the evidence, closing arguments and instructions to the jury. Approximately two and a half hours were consumed in the evidence phase.

The jury retired at 3:54 p.m. and returned at 4:44 p.m. The following colloquy then took place:

"THE COURT: Let the record reflect that all twelve jurors, both attorneys, and the defendant are present. I have here a note that seems to be written by the foreman. Who is the foreman?

"THE FOREMAN: I am.

"THE COURT: It says, 'We voted twice and have talked. Six to six both times. Need further instructions.'

"Is it your opinion, Mr. Foreman, that you could not reach a verdict? Is that what you are saying?

"THE FOREMAN: At this particular point, with the information that we have, it would appear that way. There were some definite questions that kind of were unanswered that we would like to know before any—

"THE COURT: Well, I can't give you any more than what's been given.

"I am going to ask each juror individually—I am going to put a question to you. I want you to listen to the question and answer it just yes or no. Don't give me any talk with it. Just yes or no."

Each juror was then asked if he or she thought a verdict could be reached if deliberations continued. Ten jurors answered "no" and two answered "yes." The court then declared a mistrial.

The issue is whether the judge abused his discretion in peremptorily discharging the jury without knowing what the foreman's request "for instructions" meant and without inquiring as to the nature of the "information" the jurors wanted or the questions they desired to be answered.

Judicial discretion has its limitations. As the Supreme Court instructed in *People* v. *Rist* (1976) 16 Cal.3d 211, 219 [127 Cal.Rptr. 457, 545 P.2d 833]: "[W]e are mindful that judicial discretion is by no means a power without rational bounds. "'. . . The term [judicial discretion] implies absence of arbitrary determination, capricious disposition or whimsical thinking. It imports the exercise of discriminating judgment within the bounds of reason. [¶] To exercise the power of judicial discretion all the material facts in evidence must be both known and considered, together also with the legal principles essential to an informed, intelligent and just decision."' [Citations.]"

Upon returning to the courtroom the foreman did not say that the jury was in all events unable to reach a verdict. The clear import of the colloquy is only that it could not reach a verdict without "further instructions" and without having certain questions answered. The court made no inquiry of the jurors to clarify and determine precisely what the jurors wanted, or to identify the further instructions they felt would be helpful in their deliberations. Without making such inquiry, the court acted without full knowledge of all the material facts. Without knowing more specifically what the jurors wanted, and without having offered to reread evidence and/or instructions that might have been helpful to the jury, the court was in no position to conclude that the jury could not arrive at a verdict. It could well have been that a rereading of evidence or instructions would have facilitated an early decision.

Keeping in mind that the jury had been out for only 50 minutes, the conclusion is inescapable that in dismissing the jury at that juncture the court acted arbitrarily and without full knowledge of all the material facts and therefore abused its discretion. (See *People* v. *Rist, supra*, 16 Cal.3d at pp. 220-221.) Accordingly, the court's action in dismissing the jury because it concluded the jurors were unable to agree was not justified by legal necessity because the judge did not have sufficient information upon which to base a conclusion that there was no reasonable probability that the jury could agree. (Pen. Code, § 1140.) It follows that the discharge was premature and a retrial was barred. (See *Paulson* v. *Superior Court* (1962) 58 Cal.2d 1, 5, 8 [22 Cal.Rptr. 649, 372 P.2d 641].)

■ Respondent has not mentioned the point that the defense of double jeopardy was waived by appellant's failure to raise it at the second trial. (*People* v. *Belcher* (1974) 11 Cal.3d 91, 96 [113 Cal.Rptr. 1, 520 P.2d 385].) However, since the plea had merit, trial counsel's failure to raise it resulted in the withdrawal of a crucial defense from the case, thereby depriving appellant of the assistance of adequate counsel to which he is entitled. (*Id.*, at pp. 95-96; *People* v. *Pope* (1979) 23 Cal.3d 412, 425-426 [152 Cal.Rptr. 732, 590 P.2d 859].) Adequacy of trial counsel has been raised in this appeal, and appellant was deprived of adequate counsel in this regard as a matter of law. (*People* v. *Belcher, supra*, 11 Cal.3d at p. 101; *People* v. *Pope, supra*, 23 Cal.3d at pp. 425-426.)

Since the cause will be reversed on the ground of inadequate counsel, we need not discuss the other issues raised in this appeal.

The judgment is reversed and the cause is remanded to the trial court with directions to dismiss the case.

Zenovich, J., and Hamlin, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.