[No. B191701. Second Dist., Div. Two. Dec. 21, 2006.]

PEDRO ZUMUDIO CARRILLO, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

Counsel

Janice Y. Fukai, Alternate Public Defender; Felicia K. Grant and Vito Caruso for Petitioner.

No appearance for Respondent.

Steve Cooley, District Attorney, Lael R. Rubin, Head Deputy District Attorney, Brentford J. Ferreira and Phyllis C. Asayama, Deputy District Attorneys, for Real Party in Interest.

## Opinion

**BOREN, P. J.**—Petitioner Pedro Zumudio Carrillo (Carrillo) was charged with various crimes, including committing murder for the benefit of a criminal street gang. Defense counsel, as a trial tactic, elected not to move prior to trial to suppress Carrillo's confession, deciding instead to allow the jury to hear Carrillo's tape-recorded interview with the police in its entirety. After a portion of the taped interview was played for the jury, the trial court concluded Carrillo's confession had been coerced. The court found that defense counsel's failure to move to suppress the confession constituted ineffective assistance per se and sua sponte declared a mistrial. Carrillo asserts in this proceeding in prohibition that the double jeopardy provisions of the state and federal Constitutions bar retrial. We agree and grant his petition.

## I.  FACTS

On May 3, 2005, an information was filed charging Carrillo with first degree murder, two counts of assault with a firearm, attempted second degree robbery and making criminal threats. It was alleged the murder was committed while Carrillo was engaged in the commission of the attempted robbery, and that a principal personally and intentionally discharged and used a handgun, which caused great bodily injury. It was also alleged the crimes were committed for the benefit of the Orphans, a criminal street gang.

A. *Prosecutor's Opening Statement.*

Trial commenced on March 20, 2006. In his opening statement, the prosecutor told the jury evidence would be introduced to establish the following facts.

On May 29, 2004, about 11:30 p.m., Carrillo was present at the wedding of Oscar Gutierrez, an Orphans gang member. Also at the event were fellow gang members Alfredo Villa, known as "Joker," and Mario Padilla, known as "Puppet." Puppet approached Carrillo and told him, "If you're down for the barrio, let's go do a hale, a job."[1] Because Carrillo did not want Puppet to think he was a "pussy," he drove Joker and Puppet to 8th Street and Union Street in Los Angeles.

After leaving Carrillo's vehicle, Puppet walked up to Edward Brown, put a gun to his head and said, "Orphans, this is Orphans." Puppet then walked into a nearby liquor store, waved the gun around and stated, "This is Orphans, do you want it? Do you want it?"

Puppet left the liquor store and walked across and down the street to a pay phone. The murder victim, Victor Fernandez, was on the pay phone talking to his wife in Guatemala. She heard a male voice state in Spanish, "Give me your wallet. Give me your money. Give me your cell phone." Fernandez then stated, "Take it. I don't have any money." The victim's wife then heard several gunshots.

Angie Ruiz and Jose Alaniz, residents of an apartment building located across the street from the pay phone, heard gunshots and looked out the window. They saw a man pointing a gun at Fernandez and saw Fernandez backing away. Fernandez then ran, dodging and weaving down the street as the shooter took additional shots. Fernandez then fell, facedown. The shooter ran to a black, two-door sedan parked in the darkest part of a parking lot. The windows were tinted and there were no license plates on the car. After the shooter entered the car, the driver quickly drove away down a dark alley.

The prosecutor told the jury that shortly after the murder, Oscar Gutierrez contacted the police and gave a statement. Jeff Breuer, a homicide detective with the Los Angeles Police Department, would explain that Gutierrez contacted the police because Gutierrez was upset because Puppet had shot a wedding guest. Two months after the murder, Gutierrez gave a second statement, which was taken by Detective Breuer. This statement, which was tape-recorded, implicated Carrillo in the murder. The prosecutor warned the jury that Gutierrez would deny making any statements to police and would claim that because he was drunk on the night of the murder he could not remember all of the events of that night.

---

[1] The prosecutor said that a gang officer would testify that in gang parlance doing a "hale" meant that the gang members were going to do a "job" to show their loyalty to the gang. Doing a "job" meant the gang members were going to go out into the community to instill respect for and fear of the gang. If the individuals they confronted were rival gang members (enemies), they would be shot. If the individuals were "random citizens," they would be robbed.

The prosecutor next addressed Carrillo's three-hour, tape-recorded interview, which was taken by Detective Breuer and his partner in October 2004. The jury was told it would hear Carrillo initially denying any involvement in the murder, but that after about 25 minutes Carrillo would admit the black Honda used in the murder belonged to him. He would claim, however, that he gave the keys to Joker and Puppet. Then, about 45 minutes into the interview, Carrillo would admit he was the driver; that he drove to an area near the intersection of 8th Street and Union Street and parked the car; Puppet told him he was going to "walk the neighborhood and look for enemies";[2] and as Puppet left the car, Carrillo saw that he had a gun. Carrillo would also say, "over and over again" that the shooter was Puppet.

The prosecutor candidly admitted that the jury would also hear Detective Breuer repeatedly telling Carrillo that he, Breuer, knew the shooter was Joker. The prosecutor explained, however, that following Carrillo's interview, Breuer discovered additional evidence which led him to conclude that his initial belief that Joker was the shooter was incorrect; that, in fact, Carrillo "was right about every detail; that the shooter was . . . Puppet, not Joker."

In closing, the prosecutor told the jury he was sure that they would come to understand that Carrillo knew that crimes were going to be committed when he heard Puppet say that if Carrillo was "down for the barrio," he would "do a hale," and that he, Puppet, was going to "walk the neighborhood and look for enemies." The prosecutor believed the jury would agree "that by positioning the getaway car in that darkened parking lot with the headlights off so Puppet could make an escape," Carrillo had aided and abetted the murder of Victor Fernandez, and had engaged in and furthered gang activity.

## B. *Defense Counsel's Opening Statement.*

In his opening statement, defense counsel, Vito Caruso, admitted that Carrillo was the driver of the black Honda seen on the night of the murder. Caruso claimed, however, that the evidence would show Carrillo was coerced into going with Puppet and that at no time did Carrillo agree to commit a crime and at no time did he know a robbery was going to occur, much less a shooting.

According to Caruso, the evidence would show that Puppet and Carrillo had never met before the night of the murder, and that Puppet, who was attending the Gutierrez wedding without being invited, had approached Carrillo and manipulated him into driving to 8th Street and Union Street, on

---

[2] The prosecutor explained that a gang member would understand this statement to mean that Puppet was going to protect the gang's "turf" by confronting anyone on gang territory and letting them know the territory belonged to the Orphans gang.

the pretext that Puppet wanted to get some cigarettes. Caruso described Puppet as an older, more experienced gang member who was a "pretty intimidating guy." Carrillo, on the other hand, was described as "easily manipulated." Caruso admitted that Carrillo was no "choir boy," but noted that at the time of the murder he had no criminal record, was working construction, and had a family and a girlfriend. Caruso said that Carrillo was an Orphans gang member because he had been "jumped in," but downplayed his involvement, describing him as a "tagger" who marked up walls with graffiti.

Caruso assured the jury that once it heard Carrillo's tape-recorded interview with the police the jury would see that Carrillo had been manipulated, and that Detective Breuer had "bullied" Carrillo "into giving a false confession" and "into basically saying his good friend [Joker] was the shooter." Caruso conceded that it was "apparently okay" for the detective to lie to Carrillo by telling him that Joker had admitted being the shooter and had "laid out" Carrillo by telling the police that Carrillo was the driver of the getaway car. Caruso claimed the jury would see that the prosecution was basing its entire case on the jury's believing only certain segments of the tape and disregarding other aspects of the tape. Caruso concluded that the tape would show that although Carrillo was scared and less than forthcoming when he first talked to the police, he eventually came "clean" and told the police that Puppet was the shooter and that he, Carrillo, did not know that the killing was going to occur.

Caruso emphasized that the police "wouldn't let up" until Carrillo told them what they wanted to hear, i.e., that Joker was the shooter, rather than Puppet, and that he, Carrillo, went with Puppet and Joker to "go look for enemies." Caruso claimed that in order to force Carrillo to make these false admissions, Detective Breuer and his partner repeatedly told Carrillo "you can be with us or against us. You can be a witness and walk home, go home or you can be a defendant." After a "long time," Carrillo started saying what the detectives wanted him to say.

Caruso concluded that after listening to the evidence, testimony and trial court instructions, the jury would find Carrillo not guilty.

C. *Prosecution Witnesses.*

Following opening arguments, Edward Brown took the stand and testified exactly as the prosecutor said he would, including that he saw the man who assaulted him run to a dark-colored, two-door Honda, which was parked "sideways." The car, with the headlights off, left the driveway and went through an alley. Brown identified a photograph of Carrillo's vehicle as the car he saw on the night of the murder.

Angie Ruiz also testified as the prosecutor indicated she would in his opening statement. She said that after she looked out the window of her apartment she saw a man running toward a black car parked in a driveway of the shopping center across the street from where she lived. The car was facing the driveway. The headlights were off. When the individual running toward the car got in, the driver immediately "took off" and "went straight to the alley." The headlights were still off. Jose Alaniz's testimony was very similar to that of Angie Ruiz. He testified that he saw the black car that was parked in the driveway, and that when the shooting started, he saw it pull up and wait by the driveway.

As the prosecutor warned in his opening statement, Oscar Gutierrez testified that he did not remember speaking to police, insisting that he got drunk at the wedding and remembered little of the events occurring on the night of the murder. He denied being a member of the Orphans gang. Although he admitted that Carrillo had been invited to the wedding, he denied Puppet was there, even after being shown a wedding photograph showing Puppet as an attendee. Gutierrez did not remember having a conversation with Carrillo. He did not remember Carrillo telling him that he had been approached by Puppet, who told Carrillo that "If you're down for the barrio, let's go do a hale." Nor did Gutierrez remember Carrillo telling him that because he, Carrillo, did not want Puppet to think he was a "pussy," he drove Puppet to the 8th Street and Union Street location; or that after the murder Carrillo came up to him and said, "We just did a drive-by." Gutierrez also denied telling the detectives that Carrillo was a "youngster" who felt he "needed to go along" with Puppet, and that Carrillo told him he drove Puppet to the murder location and saw Puppet with a gun.

During cross-examination, Gutierrez testified he did not know he was being tape-recorded by the police and that the detectives put words in his mouth and told him what to say. He claimed he only told the police that he had "heard rumors."

On redirect, Gutierrez denied telling detectives that three months prior to the murder he visited Joker's home and that while he was there, Puppet, who was visiting along with Carrillo, told the group they needed to do some "hale" and that they would "start with . . . La Raza Loca and push the 18th Street [gang] out of the area." Gutierrez also denied telling detectives that Puppet asked him if he wanted to buy a gun from him, a gun Gutierrez described as a chrome, shiny handgun.

Michael Patriquin, a police sergeant, testified that about two months prior to the murder, about 2:30 a.m., he was driving a patrol car when he saw freshly sprayed paint on a building. As he approached the building, three

Hispanic males jumped into a car and sped away. Sergeant Patriquin stopped the car. Two of the males identified themselves as Pedro Carrillo and Alfredo Villa (Joker).

Detective Breuer testified that at some point during his investigation he determined that a black Honda had been used in the murder and that Carrillo was the driver. Detective Breuer admitted that he and his partner had lied to Carrillo during the October 2004 police interview about Joker in order to get Carrillo to say "who the shooter was." According to Detective Breuer, this was an acceptable interview technique used by police to show a suspect "that we know the facts of [the] case in order to try and get him to tell us what he knows." When asked what kinds of things they told Carrillo that were not true, Detective Breuer stated they told him the surveillance cameras showed Carrillo driving the black Honda and depicted where his vehicle was parked, and that the detective had spoken with Joker, who had given them a statement. Detective Breuer said that in June 2005, several months after he interviewed Carrillo, he learned that Puppet was the shooter rather than Joker.

Detective Breuer testified about the content of Gutierrez's statements to police, and identified a tape recording of the interview he had with Gutierrez. A small portion of the tape was played for the jury.

### D. *The Tape Recording of Carrillo's Police Interview.*

On March 22, 2006, the third day of trial, defense counsel asked the court to play for the jury Carrillo's tape-recorded interview with the police. Counsel indicated that the interview had lasted about three hours and noted that Carrillo did not know he was being tape-recorded.

The jury was provided with a 300-page transcript of Carrillo's interview. A portion of the tape was played for the jury, to page 80 of the transcript.

### E. *The Sua Sponte Declaration of Mistrial.*

After listening to about a third of the tape,[3] the court indicated it was becoming "increasingly concerned" that Carrillo's confession was "coerced," and stated it did not "know what to do about it." Upon being questioned by the court, Caruso stated that no pretrial suppression motion had been filed.

---

[3] The court stated it had "listened to the tape for the first hundred pages of the transcript."

The prosecution then presented the People's position, claiming that while a small portion of the interview could be deemed unreliable, the confession, itself, was not coerced.[4]

The court then stated: "Let's not talk details here. Let's talk legal issues. [¶] You started trial with what you believe is a confession. You are here in trial. The court hears the statement. The court is coming to the conclusion that this is a coerced statement. There was no motion to suppress. [¶] What does the court do?"

The prosecutor urged the court to "continue reading until the portion which is right around the corner, your Honor, which is page 100 and on. And to take that into consideration as far as the nature of what's said."

The court replied, "I think it's unfair to the prosecution for the court to suppress the statement [midtrial]. . . . And that is because jeopardy has attached."

Caruso explained that "this is in fact the trial tactic that I chose. I thought of suppressing the statement based on it's obvious coercion. [¶] However, the tactic I chose was that it was so coercive and so obvious, the fact at the very end of the tape—not the very end—but after a little while he starts saying, okay, it was [Joker] who was the shooter. I drove [Joker]. [Joker] got the gun from Puppet. And it's the tactic that I chose because I found that in my opinion it would be the most beneficial tactic for . . . Carrillo in a trial."

The court replied, "The point is, no motion to suppress was made. We're in trial. The court is very concerned from a legal perspective that the court would have suppressed this statement for being coercive based upon what I have heard so far. Not only are the detectives lying to him, which is certainly permissible under the law, it is the extent and nature of the lies that are of concern. [¶] I think the detective's activities went over the top in their questioning and we're only to page 100. [¶] I'm advised that what later comes is the defendant finally acknowledges and frankly the coerciveness of

---

[4] The prosecutor stated: "It's actually at page 100 at the very bottom where . . . Carrillo gives the rendition which we believe to be the full rendition from being at the wedding to what happens at the very end. It's the entire—it lays everything out. And [Carrillo] continues to state in this version that it's Puppet, that it's not [Joker]. [¶] Our position is, that the only portion of this statement that's unreliable are those portions that deal with—I guess the whole mantra, the theme of this interview, that they're trying to have him say it was Joker. But I don't think—there is no other area where they are using any coercion or any influence to try to get him to say anything else. [¶] They're not trying to get him to talk about anything except they're trying to get him to say that the person in the photo is Joker and I think when you have something limited like that—it would be very different if he's saying, I don't know anything about it. I don't know anything about it."

the statement I think would be implicit in his relinquishing of what the People now feel is the truth to adopt what the detective says is—who the shooter was. [¶] And why that is not coercive on its face is beyond me and why I should not suppress this statement [midtrial] is what I am wrestling with."

The court reasoned that if it was "told it was a matter of trial strategy, that we should play this case to the end. If the defendant is convicted, the court then would entertain a motion for a new trial, presumably grant the motion for a new trial on the fact that this was an impermissible illegally obtained conviction because it rests on a coerced statement." The court again stated it did not know what to do.

The prosecutor once more asked the court to consider the entire interview. "I don't believe that at this point if the court were to read an additional twenty pages that the defendant would in fact concede to what the detectives are trying to get him to say. [¶] He still maintains it's Puppet."

The court refused, stating, "He's still trying to tell the truth despite the detective's most forceful efforts to get him to vary from what the People now believe is the truth." According to the court, what the prosecutor's office was "failing to see—is that if the detectives can get the defendant to tell them something that is false, then why in the world should this jury be allowed to rely on any statements the defendant makes about his own involvement?"

The prosecutor then stated: "My response to that, your Honor, would be I am going to ask them to consider everything up until the point where he says it's [Joker]." The court replied that "the jury should not decide the issue of whether a statement is coerced. That is not up to the jury. It's a legal question for the court. That is the dilemma I have. I don't know what to do with this. [¶] Do I suppress it now? What do I do?"

Caruso then stated, "Your Honor, that is why in my opening statement I said that they're going to try and convict . . . Carrillo on a patchwork, on a hodgepodge of facts taken and put out of context. [¶] I wanted the jury to hear the coercive nature of this tape because I wanted them to see the outrageous conduct in this case. [¶] There were other ways . . . there was the danger of having Oscar Gutierrez and other witnesses [who would testify and the jury would hear] damaging aspects [with respect to] Carrillo. In my opinion this was the only way for the jury to hear . . . why [Carrillo] said the things he said. This is a two prong problem."

The court declared that "if we go forward with the case, I would feel compelled to grant a new trial based upon what I have heard so far."

The prosecutor then asked the court for an opportunity to speak with defense counsel and the court recessed for lunch. When trial resumed, the prosecutor advised the court that he had informed his supervisor of the court's interpretation of the case with respect to Detective Breuer's interview with Carrillo and had been instructed to ask if the court would strike that portion of the testimony.

The court refused, stating that the damage had been done, and that in the court's view it was "irretrievable," because "[t]here was discussion in opening statement[s] of a confession."

The court then informed counsel that "having thought about it, that I should grant the mistrial. I think a motion to suppress the statement should have been made in advance of trial. [¶] I feel that counsel has said it was trial strategy to do otherwise. I believe that is incorrect. I hate to base a finding on what the court perceives to be basically incompetency of counsel but I think that is what this was, to not move to suppress the statement."

The court then stated, "I have a great deal of respect for Mr. Caruso. I have no doubt that he thinks this was a good strategy decision and perhaps it was. But I feel based on my hearing of the spoken words and the reading of the transcript, that this was a clearly coercive confession. [¶] My goodness, when a man is influenced to say something that is false that the prosecution knows is false or now believes to be false, how in the world can anyone rely on that as a valid statement of guilt when the defendant says I was part of it but let me tell you a false story that's being coerced by the detective under these circumstances. [¶] It's just incredible to this court that the district attorney's office would not see that and try to base a prosecution on such a statement. [¶] So I am going to declare a mistrial on the court's own motion finding that it would be a deprivation of this defendant's constitutional rights to go forward. [¶] I am keeping the case. I am going to set it for retrial on a date certain."

Caruso then advised the court that "if the People want to join, I would waive jury and continue the proceedings right now with a court trial." The prosecutor did not reject the offer. Rather, he advised the court that he believed "that sort of decision on a special circumstance case requires Chief Deputy approval."

The court refused to allow the prosecutor to consult with his office, stating: "No, no, I am not going to mess around with the district attorney's office anymore on this. [¶] All right. The court has declared a mistrial."

*F. Carrillo's Motion to Bar Prosecution.*

On April 18, 2006, Carrillo filed a motion to bar prosecution, asserting that there was no legal necessity for the mistrial and that it would constitute double jeopardy to retry him. Caruso further explained his decision not to move to suppress Carrillo's confession, advising that he introduced the taped interview as an intentional trial tactic, and that his decision was not "based frivolously or without great thought and input from others." Caruso explained that he was "aware of the value of having a jury hear from [Carrillo] without being subjected to cross-examination by the assigned district attorney. And finally, it was clear that there would be an additional benefit of the jury hearing a completely different side of the detectives who unquestionably would testify in the most positive and forthright of ways."

The trial court stated that a "legal necessity" existed for the mistrial based on the incompetency of defense counsel and denied the motion. This petition for writ of prohibition followed.

## II. CONTENTION

Carrillo contends the trial court erred in denying his motion to bar prosecution because there was no legal necessity for mistrial under the circumstances of this case.

## III. DISCUSSION

A. *Writ of Prohibition.*

█  Prohibition is an appropriate remedy to prevent retrial when a defendant has been once in jeopardy. (*Paulson v. Superior Court* (1962) 58 Cal.2d 1, 5 [22 Cal.Rptr. 649, 372 P.2d 641].)

B. *Standard of Review.*

Although orders *denying* mistrials are reviewed for abuse of discretion, it does not appear our Supreme Court has applied this standard to orders *granting* mistrials. The court's only pronouncement concerning the standard to be used in granting a mistrial is that they should only be granted "when a party's chances of receiving a fair trial have been irreparably damaged." (*People v. Bolden* (2002) 29 Cal.4th 515, 555 [127 Cal.Rptr.2d 802, 58 P.3d 931].) The People urge us to construe this language to mean that orders granting mistrials are reviewed for abuse of discretion. However, we need not decide the issue because this case involves application of the principle that an

error of law constitutes an abuse of discretion. (*City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297–1298 [255 Cal.Rptr. 704].)

## C. *The Double Jeopardy Doctrine.*

■ The double jeopardy clause of the United States Constitution guarantees that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb . . . ." (U.S. Const., 5th Amend.) The provision is applicable to the states through the Fourteenth Amendment. (*Benton v. Maryland* (1969) 395 U.S. 784, 794 [23 L.Ed.2d 707, 89 S.Ct. 2056].) The analogous clause in the California Constitution provides that "[p]ersons may not twice be put in jeopardy for the same offense . . . ." (Cal. Const., art. I, § 15.) These federal and state provisions are intended to prevent successive punishments for a single criminal act, assure that acquittals are meaningful, prevent harassment of the defendant through a series of aborted criminal proceedings and to spare the accused the financial, physical and psychological burdens accompanying trial. (*Gomez v. Superior Court* (1958) 50 Cal.2d 640, 644 [328 P.2d 976]; *Curry v. Superior Court* (1970) 2 Cal.3d 707, 714 [87 Cal.Rptr. 361, 470 P.2d 345] (*Curry*).)

Once a defendant is placed on trial in a court of competent jurisdiction, on a valid accusatory pleading, before a jury duly impaneled and sworn, a discharge of that jury without a verdict is equivalent in law to an acquittal and bars a retrial, unless the defendant consents to the discharge or legal necessity requires it. (*Curry, supra,* 2 Cal.3d at p. 712.) A defendant is under no duty to object in order to claim the protection against double jeopardy and his silence in the face of an ensuing discharge cannot be deemed a waiver. (*Id.* at p. 713.) Even when an error prejudices a defendant's prospects of securing an acquittal, he may nonetheless withhold consent. He may prefer to proceed with trial rather than begin the process anew in order to minimize the embarrassment, expense, and anxiety associated with trial. (*Id.* at p. 717.) "These considerations are peculiarly within the knowledge of the defendant, not the judge, and the latter must avoid depriving the defendant of his constitutionally protected freedom of choice in the name of a paternalistic concern for his welfare." (*Ibid.*)

Mistrial in this case was declared midtrial in a court of competent jurisdiction, on a valid accusatory pleading, before a jury duly impaneled and sworn. Thus, jeopardy had attached. Although Carrillo did not specifically object to the mistrial, neither did he consent. Since the jury was discharged without a verdict, the only remaining issue is whether there was a legal necessity for a mistrial.

D. *Ineffective Assistance of Counsel Does Not Ordinarily Constitute Legal Necessity.*

1. *California Has Placed Limitations on What Constitutes Legal Necessity.*

California provides its citizens a greater degree of protection against double jeopardy than that provided by federal law by placing limitations on what constitutes "legal necessity."[5] (*Curry, supra,* 2 Cal.3d at p. 716; *Raven v. Deukmejian* (1990) 52 Cal.3d 336, 352–355 [276 Cal.Rptr. 326, 801 P.2d 1077] [California Constitution may be interpreted in a manner more protective of a defendant's rights than that extended by the federal Constitution as construed by the United States Supreme Court].) A judicial error of law or procedure does not constitute legal necessity. (*Larios v. Superior Court* (1979) 24 Cal.3d 324, 331–332 [155 Cal.Rptr. 374, 594 P.2d 491], citing *Curry, supra,* 2 Cal.3d at pp. 713–714 [even "palpably prejudicial" errors in evidentiary rulings do not give rise to legal necessity for declaring a mistrial without the defendant's consent].) Rather, "legal necessity for a mistrial typically arises from an inability of the jury to agree [citations] or from physical causes beyond the control of the court [citations], such as the death, illness, or absence of judge or juror [citations] or of the defendant [citations]." (*Curry, supra,* 2 Cal.3d at pp. 713–714.)

In a case decided after *Curry,* legal necessity was found where a judge disqualified himself during a juvenile court hearing, explaining that he could not fairly and impartially consider the evidence. (*T.P.B. v. Superior Court* (1977) 66 Cal.App.3d 881, 883 [136 Cal.Rptr. 311].) The appellate court affirmed the grant of mistrial, finding that the disqualification of a judge does "not involve a mere error of law or procedure; rather it involve[s] the very jurisdiction of the trial judge to proceed with the action." (*Id.* at p. 886.)

2. *Ineffective Assistance of Counsel Constitutes Legal Necessity Only in Extreme Circumstances.*

Three cases have held that ineffective assistance of counsel may, in extreme circumstances, constitute legal necessity for a mistrial. (*People v. Manson* (1976) 61 Cal.App.3d 102 [132 Cal.Rptr. 265] (*Manson*); *People v. McNally* (1980) 107 Cal.App.3d 387 [165 Cal.Rptr. 715] (*McNally*); *People v. Coleman* (1992) 9 Cal.App.4th 493 [11 Cal.Rptr.2d 800] (*Coleman*).)

---

[5] The People contend that the double jeopardy clause of the state Constitution should not be construed differently from its federal counterpart, and that the California Supreme Court's "reasons for not following United States Supreme Court standards, as expressed in [*Cardenas v. Superior Court* (1961) 56 Cal.2d 273 [14 Cal.Rptr. 657, 363 P.2d 889] and *Curry*] . . . are no longer valid." As an intermediate appellate court, we have no authority to overrule our state's highest court. (*People v. Briscoe* (2001) 92 Cal.App.4th 568, 595 [112 Cal.Rptr.2d 401].)

In *Manson*, the attorney for codefendant Leslie Van Houten disappeared without a trace near the end of trial. Another lawyer was appointed, over Van Houten's objection. (*Manson, supra*, 61 Cal.App.3d at p. 197.) Prior to closing argument, Van Houten moved for a mistrial, arguing that new counsel could not effectively argue credibility, because of his absence during the taking of evidence. The motion was denied. (*Id.* at p. 198.) On appeal, the court acknowledged there was no per se rule a mistrial must be granted upon counsel's unavailability. (*Id.* at p. 203, fn. 102.) The court concluded, however, that fair administration of justice required reversal, emphasizing that the right to assistance of counsel is the right to effective representation, including effective closing summation. (*Id.* at p. 198.) The court also discussed at length the significance of continuity of representation, and concluded that the dimension of the case was such that substituted counsel could not assume a meaningful adversary role. (*Id.* at pp. 199–201.) Therefore, the substitution deprived Van Houten of the minimal requirement of effective counsel. The disappearance of Van Houten's lawyer was an event of legal necessity, which should have resulted in the granting of a mistrial, in the same manner as would the absence of judge or juror. (*Id.* at p. 202.)

In *McNally*, a disabling conflict was discovered by defense counsel mid-trial. The trial court declared a mistrial, prompting the defendant to move for an order entering a plea of once in jeopardy. (*McNally, supra*, 107 Cal.App.3d at p. 389.) The court granted the motion and dismissed the information, finding the defendant did not consent to the mistrial, and that there was no legal necessity for its granting. (*Ibid.*) The People appealed, claiming that legal necessity required the mistrial and that the defendant's consent was therefore unnecessary. The appellate court agreed, finding that "the development which led to the mistrial was not simply a legal or procedural error; rather, counsel's belated discovery of his conflict of interest struck at [the defendant's] constitutionally guaranteed right to assistance of counsel. [Citations.] If counsel must represent conflicting interests or is ineffective because of the burdens of representing more than one defendant, the injured defendant has been denied his constitutional right to effective counsel. [Citations.]" (*Id.* at pp. 391–392.) Because defense counsel could no longer effectively represent the defendant, defense counsel became " 'absent' as did the judge in *T.P.B. v. Superior Court, supra*, 66 Cal.App.3d 881, when he disqualified himself." (*McNally, supra*, 107 Cal.App.3d at p. 392.) The court concluded "that when, during a trial, the attorney for a defendant discovers and declares a conflict of interest, and when the trial court concludes that conflict may prejudicially affect the defendant's right to effective counsel, legal necessity requires a mistrial. The defendant's consent to the mistrial under such circumstances is unnecessary." (*Id.* at p. 393.)

In *Coleman*, following defense counsel's opening statement and after a witness had commenced testifying, the defendant moved to substitute counsel

pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]. (*Coleman, supra*, 9 Cal.App.4th at p. 494.) The defendant told the court he wanted a new attorney because his initial defense counsel had misstated the evidence in her opening statement. The defendant claimed that if he testified, the jury would perceive him as a liar because of defense counsel's statement. Defense counsel objected to the *Marsden* motion and urged the court to grant a mistrial. The court denied the motion for a mistrial without prejudice and granted the *Marsden* motion. Substitute counsel was appointed, and the case was continued to allow counsel to prepare for trial. After the People rested, the defendant moved for mistrial. Defense counsel argued that his predecessor's opening statement necessarily undermined his position in defense of the case because the jury was left with the impression that defendant had changed stories between defense counsel. When asked by the court if he wanted to discharge the existing jury for another one, the defendant indicated he did not understand what the court was saying. The prosecutor argued that the court could not grant a mistrial unless the defendant specifically asked for one. The court denied the motion, and the defendant was convicted. (*Coleman, supra*, 9 Cal.App.4th at p. 495.) On appeal, he claimed that legal necessity required a mistrial when his defense counsel misstated the evidence in her opening statement. (*Id.* at p. 496.) The *Coleman* court agreed. Relying on *McNally* and *Manson*, the court found that "defense counsel's misstatement of the evidence in her opening statement undermined [the defendant's] credibility and created a conflict of interest. This event caused a breakdown in the relationship between [the defendant] and his counsel and frustrated the realization of a fair trial." (*Coleman, supra*, at pp. 496–497.) The court concluded that, as in *McNally*, "the conflict between [the defendant] and his counsel amounted to legal necessity for a mistrial." (*Coleman, supra*, at p. 497.)

### 3. *The Present Case Did Not Involve Extreme Circumstances.*

The People claim that this case falls within the parameters of *Manson*, *McNally* and *Coleman*.[6] We disagree. In *Manson*, the defendant's attorney disappeared midtrial and substitute counsel, claiming he could not effectively

---

[6] In addition to *Manson*, *McNally* and *Coleman*, the People point to an out-of-state case, *State v. Moran* (1988) 231 Mont. 387 [753 P.2d 333], for the proposition that ineffective assistance of counsel constitutes legal necessity for a mistrial. In *Moran*, the trial court found that defense counsel's performance was so deficient that it amounted to ineffective assistance of counsel and granted a mistrial. (*Id.*, 753 P.2d at p. 335.) The Montana Supreme Court affirmed, finding "manifest necessity" for the mistrial because the attorney was too inexperienced to conduct a felony criminal trial. (*Id.* at p. 336.) We are not inclined to follow an out-of-state case, especially one decided under the less restrictive "manifest necessity" federal standard. In any event, we believe *Moran* should be narrowly read to mean that legal necessity may exist in instances where defense counsel's conduct severs the attorney-client relationship and thus amounts to no representation at all. This reading, we believe, is consistent with *Manson*, *McNally* and *Coleman*.

represent his client, requested a mistrial. In *McNally*, defense counsel requested a mistrial after concluding he was ethically barred from representing his client because of a conflict of interest. In *Coleman*, the defendant requested a mistrial based on substitute counsel's claim that he could not effectively represent his client because of his predecessor's negligence. None of these factors were present prior to the trial court's declaration of mistrial in this case. Neither Caruso nor Carrillo requested a mistrial, defense counsel did not absent himself during trial, no ethical bar prevented defense counsel from representing his client, and there was no evidence that a breakdown in the relationship between Caruso and Carrillo had occurred.

■    The development that led to the trial court's declaration of mistrial was Caruso's decision to introduce Carrillo's confession into evidence. After listening to about a third of Carrillo's taped interview, the court became "increasingly concerned" that his confession had been coerced.[7] The court, out of the presence of the jury, conducted a hearing, seeking guidance from counsel about what course of action to take. The People took the position that the statement was not illegally obtained. Caruso advised that although he believed the confession was coerced, he had valid reasons for introducing it into evidence. The court did not reject Caruso's claim. In fact, the court stated, "I have no doubt that [Caruso] thinks this was a good strategy decision and perhaps it was." Unfortunately, the court did not pursue the issue of whether the tactic was a valid one under the circumstances of this case. Instead, the court returned to the issue of coercion. Ultimately, the court found: (1) the confession was coerced; (2) because the confession was coerced, defense counsel should have filed a pretrial motion to suppress the confession; and (3) counsel's failure to do so constituted ineffective assistance of counsel per se. The trial court erred in so finding. The court seemed not to understand that while a defendant has a constitutional right to object to the admission of a confession obtained by illegal means (*People v. Rodriguez* (1943) 58 Cal.App.2d 415, 420 [136 P.2d 626]), a defendant may waive the right, as long as the waiver is express, i.e., not "arising from mistake and inadvertence."[8] (At p. 421.) The trial court failed to inquire of Caruso whether he had discussed the admission of Carrillo's statement with his client

---

[7] We will assume for purposes of this petition that Carrillo's confession was coerced. However, the trial court's refusal to review all of the statement before deciding the issue of coercion causes us concern, especially since the court's finding of coerciveness led to the declaration of a mistrial.

[8] "It is for the defendant to decide such fundamental matters as whether to plead guilty [citation], whether to waive the right to trial by jury [citation], whether to waive the right to counsel [citation], and whether to waive the right to be free from self-incrimination [citation]. As to these rights, the criminal defendant must be admonished and the court must secure an express waiver; as to other fundamental rights of a less personal nature, courts may assume that counsel's waiver reflects the defendant's consent in the absence of an express conflict. [Citation.]" (*In re Horton* (1991) 54 Cal.3d 82, 95 [284 Cal.Rptr. 305, 813 P.2d 1335].) In our

prior to trial and, if so, whether Carrillo had expressly waived his right to have his statement excluded.[9] As a result, the trial court failed to obtain all the information necessary to make an informed decision as to whether a breakdown in the relationship between Caruso and Carrillo had arisen sufficient to constitute "legal necessity" for mistrial. (See *People v. Medina* (1980) 107 Cal.App.3d 364, 370 [165 Cal.Rptr. 622] [declaration of mistrial improper because the trial judge did not have sufficient information upon which to base a conclusion that there was no reasonable probability that the jury could agree].) This was judicial error that led to an abuse of discretion.

### 4. The Trial Court Should Have Allowed the Case to Proceed to Judgment.

Where, as here, a trial court becomes convinced that defense tactics are denying a defendant a fair trial, the proper course of action, in the absence of the type of extreme circumstances described in *Manson*, *McNally* and *Coleman*, is to allow the case to proceed to judgment and then consider whether the defendant is entitled to a new trial. (See *Curry, supra*, 2 Cal.3d at p. 714; see also *State v. Harrison* (Iowa 1998) 578 N.W.2d 234, 239 [sua sponte declaration of a mistrial because of perceived inadequacy of defense counsel is, and should be, an extremely rare event; even when an inadequacy exists, a far safer practice would be for the court to intervene only in ruling on posttrial motions following a conviction, if indeed a conviction occurs]; *Com. v. Phetsaya* (1996) 40 Mass.App.Ct. 293 [663 N.E.2d 857, 861] [unwise for judge to declare a mistrial due to counsel's alleged ineffectiveness because it is a "chancy business" to predict a verdict a jury may return in a case].) This is what should have occurred in this case. Once Carrillo became aware of the trial court's willingness to declare a mistrial, the decision as to the extent of the prejudice allegedly caused by Caruso's decision to introduce Carrillo's confession was for Carrillo and his counsel. (*Curry, supra*, 2 Cal.2d at pp. 713–714.) The trial court's decision to declare a mistrial stripped Carrillo of his right to maintain primary control over his trial and may well have compromised his effort to prove his innocence.

### E. Defense Counsel's Tactics Were Valid in Any Event.

Even if we were to hold that ineffective assistance of counsel in less extreme circumstances than those described in *Manson*, *McNally* and *Coleman* constitutes legal necessity for mistrial, we find no inadequacy of counsel

---

view, a defendant's constitutional right to exclude a coerced confession is not a fundamental constitutional right requiring admonishment by the court.

[9] Caruso had a duty to consult with Carrillo on important decisions and to keep the defendant informed of important developments in the course of the prosecution. (*Strickland v. Washington* (1984) 466 U.S. 668, 688 [80 L.Ed.2d 674, 104 S.Ct. 2052].)

under the facts of this case. According to the People, Carrillo's only viable defense was to deny being the driver of the getaway car, and that by introducing Carrillo's statement into evidence, Caruso withdrew a potentially meritorious defense. (*People v. Ellers* (1980) 108 Cal.App.3d 943, 952 [166 Cal.Rptr. 888] [defendant's case seriously damaged by his attorney's failure to move to suppress evidence].) We disagree.

A successful motion to suppress Carrillo's statement would not seriously have weakened the prosecution's case. The evidence establishing Carrillo as the driver of the vehicle used in the murder, even without his confession to police, was strong. The prosecution established, through Gutierrez, that Carrillo, Joker and Puppet left Gutierrez's wedding in Carrillo's vehicle to commit criminal acts in an effort to instill fear of and respect for the Orphans gang. While the People downplay the effect of Gutierrez's statements to police because of his denials on the stand and because the prosecution was required to impeach him, his statements were tape-recorded. Juries are increasingly familiar with gang culture and the reasons a gang member may deny statements made to police. Thus, it is unlikely the jury would have given any credence to a defense based on Carrillo's claim that he was not the driver of the getaway car.

Carrillo's defense was that he did not intend to commit any crime and did not know that Puppet intended to commit a crime. Since Carrillo had no intention of taking the stand, the only evidence available to support his defense was contained in his three-hour tape-recorded interview with the police. While the tape contained statements incriminating Carrillo, Caruso intended to argue that these statements were the product of police coercion, and that if the jury listened to the entire tape, the jury would understand that Carrillo told the truth when he stated that, although he drove Puppet to the murder location, he did not know Puppet intended to commit murder and other crimes. We acknowledge that evidence was presented that indicated Carrillo was a willing participant in Puppet's crimes, including statements made by Gutierrez. However, Carrillo intended to argue that the statements made by Gutierrez, like those he, Carrillo, made to police, were the product of illegal acts of police coercion. Given the circumstances of this case, we conclude that Carrillo's defense that he did not intend to participate in any crime was more likely, or just as likely, to succeed as Carrillo's denying that he drove the vehicle used in the murder.

■ "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." (*Strickland v. Washington, supra,* 466 U.S. at p. 689.) On this record, we cannot conclude that Carrillo's chances of receiving a fair trial were "irreparably damaged" by Caruso's trial tactics. (*People v. Bolden, supra,* 29 Cal.4th at p. 555.)

## IV. DISPOSITION

■ We "are not unmindful of the apparent irony in denying the trial court jurisdiction to proceed because of a ruling made, at least in part, obstensibly for the benefit" of a defendant. (*Curry, supra,* 2 Cal.3d at p. 718.) However, there was no legal necessity for the trial court's sua sponte declaration of a mistrial. Thus, Carrillo's motion to bar retrial should have been granted.

Let a peremptory writ of prohibition issue as prayed. The order to show cause is discharged. The temporary stay is vacated. The trial court is directed to set aside the order denying Carrillo's motion to bar retrial and to issue a new and different order granting the motion.

Doi Todd, J., and Ashmann-Gerst, J., concurred.

The petition of real party in interest for review by the Supreme Court was denied April 11, 2007, S149866. George, C. J., did not participate therein.