Filed 2/17/23  P. v. Wright CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E077867 |
| v. | (Super.Ct.No. BAF2100027) |
| SAMUEL JAMES WRIGHT III, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Rene Navarro, Judge. Affirmed.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, and Melissa Mandel and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted Samuel James Wright III of first degree murder (count 1; Penal Code, § 187, subd. (a); unlabeled statutory citations are to this code), dissuading a witness by threat of force or violence (count 2; § 136.1, subds. (b)(1) & (c)(1)), and unlawful possession of a firearm by a convicted felon (count 3; § 29800, subd. (a)(1)), found true firearm sentencing enhancements for counts 1 and 3 (§§ 12022.53, subd. (d), 1192.7, subd. (c)(8), 667, subd. (e)(2)(C)(iii)), and in a bifurcated trial found Wright had two prior convictions that qualified as strikes (§§ 667, subds. (c) & (e)(2)(A), 1170.12, subd. (c)(2)(A)). Wright was sentenced to an aggregate prison term of 125 years to life.

Wright contends that testimony by the victim's brother that Jane Doe had told him the shooter was "'a gentleman by the name of Blue[,] and he was from the Four Corner Crips in Lake Elsinore'" was so prejudicial as to irreparably damage his chances of receiving a fair trial. He argues that the trial court had a duty to declare a mistrial sua sponte or, in the alternative, that his counsel provided ineffective assistance by failing to request one. Although the testimony was improper, we find the isolated remark did not have any prejudicial effect in the face of the strong evidence of Wright's guilt, it was not incurably prejudicial, and both the court and counsel took proper steps to mitigate any possible prejudicial impact. We accordingly affirm.

BACKGROUND

On the evening of December 28, 2020, F.R. was shot and killed outside the Hemet apartment complex where he lived with his girlfriend, Jane Doe. Jane Doe was distraught and at times "incoherent" when interviewed by police on the day of the shooting. Doe

2

told police at the scene and later that night at the police station that F.R. had been shot by two unidentified black men whose faces she did not see. The detective determined that Doe's statement was inconsistent with surveillance video of the shooting obtained from a neighboring apartment.

The morning after the shooting, F.R.'s brother, D.T., went to see Doe to find out what happened. Doe told D.T. that she had lied to the police. She said that she had been "messing with" a guy called Blue. F.R. had previously told Doe he did not want Blue around their place, but Blue was there when F.R. came home, and Blue shot F.R. in the street outside. Doe then showed D.T. where Blue lived. Doe told D.T. that she was scared that Blue would do something to her and that she was in fear for her life. D.T. told Doe she needed to do the right thing and tell the police the truth.

On December 30 and 31, Doe met with the detective and identified the shooter as Blue but said she did not know his real name. Doe provided a description of Blue, his tattoos, and where he lived, and she stated he drives a blue Buick sedan and was wearing black and white Nike shoes the night of the shooting. She later identified Wright as Blue, the shooter, from a six-photo lineup. Doe said that she had sexual contact with Blue a couple of weeks before the shooting. Doe knew that F.R. and Blue had exchanged words on two or three prior occasions. Doe said she and F.R. had been drinking on the night of the shooting and saw Blue standing on the stairs outside their apartment. Doe walked past Blue, went inside to put her bags down, and heard F.R. make a comment about not being scared of Blue's gun. Doe grabbed her umbrella because it was raining and went

3

outside to try to diffuse the situation. Doe walked past as Blue and F.R. "had words." Doe was in the street and the two men were standing on the sidewalk when Blue said, "'I'll blow your head off'" just before shooting F.R. Doe described Blue's gun as a tan and black handgun with a semiautomatic-type slide action that goes back or forward, and she said "'it's one of them made ones that you put together.'" Doe apologized for not telling the detective before and said she was afraid that Blue would find out because he said he would kill her if she said anything.

On January 5, 2021, Pomona police attempted to pull over Wright for expired registration. Wright, who was driving alone in the vehicle, jumped out of the car while it was moving and fled as the empty car rolled into a parked vehicle. The officer chased Wright, arrested him, and recovered a handgun. Consistent with the description provided by Jane Doe, the recovered gun was described at trial as a Polymer80 9-millimeter semiautomatic, black with "gold-or-tan-looking barrel" that is sold as a kit, "meaning they have to basically put that weapon together" to "make it a working firearm." Also consistent with descriptions provided by Doe, Wright was driving a blue Buick sedan and wearing black and white Nike shoes when arrested. A DNA touch test was performed showing Wright's DNA was far more likely (1.6 sextillion times) than not to have contributed to the mixture of DNA found on the gun. In addition, the jury was shown photos of Wright with what appears to be the same gun that were posted to his Facebook account less than one week before the shooting.

4

Jane Doe also testified at trial. She described F.R. as her boyfriend and said they lived together at the apartment complex where the shooting occurred. Although she was home that night, she denied seeing the shooting. She acknowledged that she knew Wright as Blue, that she had oral sex with him two times, and that F.R. did not know, but she said that happened probably at least three weeks before the shooting. Doe described F.R. as "[v]ery, very jealous" but denied that F.R. and Blue had fought, yelled, argued, threatened, or "had words." She could not recall if she saw Blue on the night of the shooting, and she denied that he had threatened her and denied ever saying he did. She recalled meeting with F.R.'s brother, D.T., the day after the shooting but denied telling him she had lied to the police.

Doe testified that she was drunk, high on pills and "just about every drug" around the time of the shooting, and "out of [her] mind" because she had just lost her father and mother within one and one-half days of each other. She testified that she was under the influence every time she spoke with police and when she met with D.T. and that she stayed drunk and high and "still out of my mind" the "whole time," so "there's a lot I don't remember." She did not remember telling police about the shooting, describing Blue's appearance or where he lived, or identifying Wright's photo, and her recollection was not refreshed by reading the transcripts of her police interviews.

Recordings of all of Jane Doe's interviews with police were played for the jury.

## DISCUSSION

During D.T.'s direct testimony, the following exchange took place:

"Q. In the course of you talking to (Jane) and her telling you that she had lied to the police, did she tell you who did it?

"A. Yes, she did.

"Q. What did she say about that?

"A. She said it was a gentleman by the name of Blue[,] and he was from the Four Corner Crips in Lake Elsinore."

A few moments later, with D.T. on the stand, the court held a sidebar conference with counsel. (The sidebar was not reported but was later described on the record by the court and counsel, outside the presence of the jurors.) The court called the sidebar to indicate to counsel that D.T.'s answer violated a motion in limine that there be "no reference to [Wright or] Blue being affiliated or associated in any shape or form with Crips." Wright's counsel stated: "I did not ask at that time for the Court to admonish the jury to disregard it because I felt and still feel that would only have highlighted it." The court then struck the remainder of D.T.'s answer after, "She said it was a gentleman by the name of Blue." The prosecutor added that the witness's comment referring to Crips was an unexpected spontaneous remark. The prosecutor stated he had no intention of eliciting any such testimony and in fact had gone to great lengths to remove any reference to Wright's criminal history, parole status, or other excluded subjects from the evidence.

6

During deliberations, the jury requested that D.T.'s direct testimony be read back. Outside the presence of the jurors, the court and counsel memorialized on the record what had transpired during that testimony and the steps that were taken to minimize any potential prejudicial effect. The court stated that D.T. "in responding to a question answered the question but then continued with his response, and that additional response included reference to the association of Mr. Wright with the . . . Crips. The Court did not at that point in time stop the witness from testifying, nor did I call for a sidebar at that time. I let the moment pass so as to not highlight that issue, and I did then . . . at the appropriate time ask the lawyers to approach while [D.T.] was still testifying. At that time at a sidebar conference, Court and counsel discussed . . . that the witness had made reference to something that the Court had [excluded] and requested that it should not be brought up during the course of the witness's testimony."

Wright's counsel stated, "I heard it and I did not object, nor did I ask that it be stricken at that time because I did not want to highlight it for the jury. I did not wish to give an instructi[on]. I did request and the Court granted—and I did make this request outside the presence of the jury—that the remark be stricken, and the Court granted that."

The prosecutor added, "I was actually so surprised by [D.T's] answer, I think . . . after that happened, I forgot to ask him something that we had talked about in 402 about what did (Jane) tell you Blue said to [F.R.] before he shot him about blowing his head off or something like that. I'll just point out that I was so surprised by his answer[—]or nonresponsive additional information[—]to my question that it distracted

7

me from asking something I had planned to ask. And then, of course, I never returned back." He also stated for the record that "there were no mention of Crips or gangs for the rest of the trial." Finally, the court stated that when the jury requested D.T.'s direct testimony be read back, "Madam Reporter reminded the court" that the remark had been stricken from the record before the testimony was read back to the jury.

### A. Mistrial

Wright argues that the court's efforts to mitigate any potential prejudicial effect of the reference were insufficient, and it had a duty, even absent any request from defense counsel, to declare a mistrial. We disagree.

A mistrial should be declared "only when a party's chances of receiving a fair trial have been irreparably damaged." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1029.) "[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial fundamentally unfair." (*People v. Partida* (2005) 37 Cal.4th 428, 439, italics omitted.) "A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]" (*People v. Haskett* (1982) 30 Cal.3d 841, 854 (*Haskett*).)

A sua sponte declaration of a mistrial in the absence of the defendant's consent, however, should be "an extremely rare event" because dismissal of the jury before it reaches a verdict will prevent the defendant from being retried except in limited instances

8

of legal necessity. (*Carillo v. Superior Court* (2006) 145 Cal.App.4th 1511, 1529 (*Carillo*).) "In California, legal necessity for a mistrial typically arises from an inability of the jury to agree [citations] or from physical causes beyond the control of the court [citations], such as the death, illness, or absence of judge or juror [citations] or of the defendant [citations]." (*Curry v. Superior Court* (1970) 2 Cal.3d 707, 713-714.) "A mere error of law or procedure, however, does not constitute legal necessity." (*Ibid.*) Even where "clearly improper" testimony has resulted in "a palpably prejudicial error," a mistrial should not be declared absent a motion or consent by the defendant. (*Id.* at pp. 714, 717.) Rather, the trial should proceed to a verdict, and, in the event of a conviction, the error can be considered on a motion for a new trial. (*Id.* at p. 714; *Carillo*, at p. 1529.)

Applying those legal principles to this case, we conclude that Wright's argument lacks merit. Wright did not request or consent to a mistrial, and there was no legal necessity for one, so the trial court should not have declared a mistrial on its own motion. Moreover, the admission of the testimony at issue was not incurably prejudicial. Our Supreme Court "has consistently found vague and fleeting references to a defendant's past criminality to be curable by appropriate admonition to the jury" (*People v. Franklin* (2016) 248 Cal.App.4th 938, 955), and the same would be true of a vague and fleeting reference to a possible association with a gang. Cases in which improper gang evidence has resulted in reversal, unlike this case, involve extensive testimony that had improperly been admitted, not an isolated remark by one witness that was immediately stricken from

the record and hence omitted from the readback of the witness's testimony. (See, e.g., *People v. Cardenas* (1982) 31 Cal.3d 897, 906; *People v. Ramirez* (2016) 244 Cal.App.4th 800, 821-822; *People v. Memory* (2010) 182 Cal.App.4th 835, 859; *People v. Albarran* (2007) 149 Cal.App.4th 214, 227-228.) Any potential prejudice from D.T.'s remark would have been cured by an appropriate admonition. (*People v. Avila* (2006) 38 Cal.4th 491, 574.)

For all of these reasons, D.T.'s remark was not incurably prejudicial, and no sua sponte mistrial was warranted.

*B. Ineffective Assistance of Counsel*

Wright argues in the alternative that even if the court had no sua sponte duty to declare a mistrial, defense counsel was constitutionally deficient for failing to make a motion for a mistrial. We disagree.

Because of the discretion afforded a trial court in granting a mistrial, "it would be a rare case in which the merits of a mistrial motion were so clear that counsel's failure to make the motion would amount to ineffective assistance." (*Haskett*, *supra*, 30 Cal.3d at p. 854.) "Nonetheless, defendant could conceivably prove incompetence if his counsel's omission was shown to be grounded in ignorance or misapplication of the law rather than tactical considerations [citations] and if the motion for mistrial bore strong potential for success." (*Id*. at pp. 854-855.) Neither is true here. Defense counsel made a reasonable tactical decision not to request a jury instruction or admonishment so as not to highlight the witness's remark, as counsel explained on the record, even though it was clear the

10

trial court would have instructed the jury to disregard the remark upon defense counsel's request. There was no likelihood that the court would grant a mistrial based on a single, isolated, fleeting comment by one witness, especially after that witness's testimony was read back to the jury without the offending remark. Nothing suggests defense counsel's failure to move for a mistrial was based on ignorance or misapplication of the law rather than recognition that it would have been a frivolous request.

For all of these reasons, Wright's trial counsel's tactical decision not to request a mistrial was reasonable and therefore did not constitute ineffective assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688.)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

MILLER
         Acting P. J.

FIELDS
         J.