Filed 2/14/23  P. v. Olvera CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>MARTIN SANTOYO OLVERA,<br><br>      Defendant and Appellant. | F082428<br><br>(Super. Ct. No. 19CR-06497C)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County.  Carol K. Ash and Steven K. Slocum, Judges.

William I. Parks, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and John Merritt, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury found Martin Santoyo Olvera (defendant) guilty of being an accessory after the fact to a murder committed by a codefendant.  The killing was alleged to be gang related for purposes of Penal Code section 186.22 (all undesignated statutory references are to the Penal Code), but the jury rejected the allegation.  However, gang allegations regarding defendant's conduct as an accessory were found true.

Defendant was convicted in a retrial following the trial court's sua sponte declaration of a mistrial based on the COVID-19 pandemic. He argues the mistrial, which was ordered over defense objections, was not legally necessary and, therefore, the retrial violated his constitutional right not to be placed twice in jeopardy. In the alternative, he argues insufficiency of the evidence. Both issues are close, but we conclude error has not been shown.

Defendant's opening brief includes a third claim based on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 and the trial court's imposition of fines and fees at sentencing. In supplemental briefing filed after the Legislature passed Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333), defendant relies on changes to section 186.22 and the creation of section 1109, which provides for bifurcation of gang enhancement allegations upon a defendant's request. We conclude reversal with the possibility of retrial is warranted in light of Assembly Bill 333. The *Dueñas* claim is therefore moot.

## FACTUAL AND PROCEDURAL BACKGROUND

### July 14, 2019

On July 14, 2019, at 11:31 p.m., a 911 caller reported hearing gunshots near Merced Avenue in the City of Merced. The caller lived on Rose Avenue, which intersects with Merced Avenue, but his residence was approximately 15 houses away from the intersection and he was unable to provide further information.

A second 911 caller, F.G., requested police assistance at the 1300 block of Merced Avenue. F.G. had also heard gunshots and could see "somebody laying down" in the street. When asked if there were any vehicles in the area, he told the dispatcher, "There's a white ca—it was a—it was a white Cadillac. It's—I don't know if it's—if this is the car." A few questions later, the dispatcher asked, "Is the white Cadillac still parked there?" F.G. replied, "No, he took off. He took off. He's long gone." The next question

2.

was, "Which way did the Cadillac go?" F.G. answered, "Going towards the Marriott out by the freeway by Motel Drive."

Police officers soon discovered the dead body of a 48-year-old man, Juan Ramirez (the victim). He was found lying on his stomach in the eastbound lane of Merced Avenue, near the address F.G. had provided to the dispatcher. An autopsy confirmed the victim sustained six bullet wounds, though one was characterized as a "graze wound." There was a front wound to the left shoulder and multiple posterior wounds, including one to the back of the head.

Investigators found 11 expended .40-caliber bullet casings and a bullet hole in a vehicle parked approximately 40 feet northwest of the victim's body, all in the vicinity of the 1400 block of Merced Avenue. It was determined the victim resided on the 1600 block of Merced Avenue, a considerable distance to the east of where he was evidently shot and killed. The police found no blood trails or droplets between the two locations.

*July 15, 2019*

In the early hours of July 15, 2019, a homicide detective interviewed witnesses F.G. and A.D. Another detective located video evidence captured by security cameras at the west end of Merced Avenue and along the northern stretch of Motel Drive. Later in the day, police spoke to the victim's neighbors and executed a search warrant at the victim's home.

**F.G.'s Recorded Statements**

F.G. had been visiting A.D. on the night of the shooting. A.D. lived on Merced Avenue, approximately one block east of where the victim's body was found.

Late that evening, F.G. and A.D. had a strange encounter with an unidentified woman. F.G. described her as a "really skinny" Hispanic female with black hair and a tattoo on her left arm. She was approximately 19 or 20 years old, was sweating profusely, and appeared to be "on drugs." The woman had attempted to enter the house,

3.

and she seemed startled and/or frightened when F.G. opened the front door. She claimed to be looking for someone named "Jesse" before wandering off west on Merced Avenue.

F.G. exited the house and saw the woman behaving suspiciously outside of another residence. A.D. called the police, and officers came out to the neighborhood to investigate. The police departed after failing to locate the woman. Approximately 10 to 20 minutes later, F.G. and A.D. heard gunshots.

F.G. recalled hearing a man "arguing with somebody" immediately prior to the shooting. He and A.D. hurried outside after hearing the shots, looked to their right (west), and saw a white car in the westbound lane of Merced Avenue. Although F.G. had said it was a Cadillac during the 911 call, he told the detective it was a two-door Chrysler. After further questioning about the make, model, and year, F.G. said, "I had told the cops 2015. But [A.D.] was like, 'No that had to be like, older—2005.['] And he pulled up a picture and it looked exactly the same as the car."

When F.G. first saw the white vehicle, its brake lights were illuminated. The car remained stationary for approximately five seconds before slowly proceeding to a stop sign at the intersection of Merced Avenue and Motel Drive, then it "took off fast."

**A.D.'s Recorded Statements**

A.D.'s statements were generally consistent with those of F.G. regarding the events preceding the shooting. After hearing gunfire, A.D. and some of his relatives exited the house behind F.G. to see what had happened. Similar to F.G.'s account, A.D. remembered running outside, looking to his right, and seeing the brake lights of a car in the westbound lane of Merced Avenue. But whereas F.G. had indicated the vehicle was stopped close to the body, A.D. said the car was approximately "two houses down" from it, meaning west of the body, "[r]ight before Rose Avenue."

The details provided by A.D. further differed from F.G.'s account in two significant respects. First, A.D. was certain the white car had turned onto Rose Avenue,

i.e., "[t]he street before the stop sign." In other words, the vehicle did not traverse Motel Drive. Second, A.D. was "pretty sure" it was a four-door Cadillac CTS.

The detective asked A.D. if he had shown F.G. "a picture of a car" (presumably referring to the one F.G. described as looking "exactly the same" as the suspect vehicle), and A.G. responded affirmatively. He then showed the detective the results of a Google images search he had performed on his phone for the term "2006 cadillac cts." All the images were of four-door vehicles. The detective informed A.D. that F.G. had said he thought it was a Chrysler. A.D. replied, "He didn't—he didn't really see. He was more payin' attention to the [dead] body."

### Security Camera Footage

A resident of the 1200 block of Merced Avenue had a video surveillance system with a camera mounted above his garage. The home was located between Rose Avenue and Almond Avenue (Rose to the east and Almond to the west), and the camera was pointed toward Merced Avenue. The grainy, low-resolution video feed showed cars passing by the house in the eastbound and westbound lanes of Merced Avenue. To a lesser extent, the feed also showed the headlights of vehicles traveling northwest and southeast on Motel Drive.

In reviewing the Merced Avenue video, police saw a white- or light-colored two-door vehicle entering the neighborhood in the eastbound lane at approximately 11:22 p.m. A second white- or light-colored vehicle, which appeared to have four doors, passed by the camera in the eastbound lane at approximately 11:26 p.m. Next, at approximately 11:29 p.m., a car resembling the previously seen two-door vehicle passed by the camera in the westbound lane.[1]

---

[1] A 24-hour screen clock showed the cars passing by at 23:21:28, 23:25:38, and 23:28:42. However, according to the police testimony, the clock was approximately one minute slow. This was a rough estimate, as the officer's comparison of the video clock to his "department-issued iPhone" was only in relation to the hour and minutes, not the hour, minutes, and seconds. For the sake of readability, most subsequent time references concerning video evidence are stated in a 12-hour format based on the approximations of the police witnesses. For example, video from

Security cameras at nearby businesses captured video of a white two-door vehicle traveling northwest on Motel Drive, toward State Highway 140 (also known as Yosemite Parkway) at approximately 11:30 p.m. Earlier footage from those cameras showed a white two-door vehicle traveling southeast on Motel Drive, toward Merced Avenue, between approximately 11:21 and 11:22 p.m.

Collectively, the videos appeared to show that a white two-door vehicle had entered the victim's neighborhood from Motel Drive at 11:22 p.m. and departed from the neighborhood via Motel Drive between 11:29 and 11:30 p.m.

**Neighbors' Statements**

Witness M.A. was contacted by the police at approximately 7:00 a.m. the day after the shooting. M.A.'s bedroom faced the victim's backyard, and she recalled waking up sometime "after midnight" to the sound of voices from that area. The voices were described "as being two males and one female." One of the males spoke in English, but the other two conversed in Spanish, and the female had seemed "kind of mad." M.A. did not report hearing any gunshots. When asked about vehicles, M.A. claimed to have previously seen a white car parked outside of the victim's home.

Another neighbor, D.M., told the police she had seen the victim on July 14th "drinking beers with a light-skinned male and two female friends that were at his house." D.M. also claimed to have heard the victim "breaking bottles in the front yard" at approximately 10:00 p.m., i.e., 90 minutes prior to the shooting. A third neighbor, A.V., reported seeing the victim sometime between 5:00 p.m. and 7:00 p.m. on the day of the

_____

a security camera at 11 West 15th Street in Merced captured footage of a moving vehicle at the purported date and time of "07/15/2019 13:59:22." But according to the police testimony, the video clock was about "14 hours and 38 minutes ahead of time." We will simply describe what the video showed on July 14, 2019, at approximately 11:21 p.m., without further noting or explaining the discrepancy.

6.

shooting. According to this witness, the victim had appeared drunk and angry "and was throwing cans of beer against the wall."**2**

**Search of the Victim's Home**

Outside the victim's residence, along a walkway leading to the backyard, police found the remnants of a food order from In-N-Out Burger. These items consisted of an upside-down French fry tray or serving boat, scattered fries, and a ketchup packet. Several aluminum cans were strewn about the same area.

Also found outside was a laminated key tag, such as might be used by a car dealership or body shop to keep track of multiple sets of keys. The preprinted strip of paper had blank spaces next to the words "Year," "Make," "Model," "Body" and "Color." Someone had scrawled "CADDY" in handwritten letters across the entire tag.

Inside the victim's home police found photographs of a man named Stuart Nagata, a piece of mail addressed to Nagata, and another document with his name on it. There was a receipt from a Big 5 sporting goods store dated July 1, 2019, for the purchase of a flashlight, golf balls, two pairs of shoes, and a $19 charge listed as "STD AMMO BCKGRND CK FEE." A separate document indicated the same store had initiated a background check for someone named Karla Perez within minutes of the transaction shown on the receipt.

Other items found inside the residence included a packaged component of a medical neck brace. According to preliminary hearing testimony, there was also an eviction notice indicating the victim was being evicted.

*July 16, 2019*

By July 16, 2019, Nagata had become a suspect in the case. He was believed to own a 1999 Cadillac Eldorado, and the police had determined the license plate number.

---

**2**The information in this paragraph comes from police testimony at the preliminary hearing. Witnesses D.M. and A.V. did not testify in court. According to the lead detective on the case, A.V. further reported that "a white Dodge four-door vehicle came to the [victim's] house" on the day of the shooting.

It was a two-door car with white paint. While conducting a "grid search" in the nearby town of Planada, the police located the vehicle at the residence of a man named Felix.

Undercover law enforcement agents surveilled Felix's residence for the remainder of the day. A maroon- or burgundy-colored Buick eventually pulled up to the house. Defendant was seen exiting the Buick and, a few minutes later, relocating to the driver's seat of the Cadillac.

At approximately 8:45 p.m., defendant departed from Felix's residence in the Cadillac. The Buick, which was then occupied by two females, followed behind defendant as he proceeded to State Highway 140. The undercover agents tailed both vehicles for approximately 15 minutes before police officers in marked cars effectuated a stop in the City of Merced.

Driving due west on State Highway 140 is the most direct path between where the Cadillac and Buick started and ended their journey. However, the vehicles took what the People describe as a "serpentine" route by detouring north on Plainsburg Road, west on Bear Creek Drive, and south on Arboleda Road. The cars resumed westbound travel on State Highway 140 at roughly the midway point between Planada and Merced.

The driver of the Buick is not identified in the record. The passenger was Annabelle Perez (Annabelle). Annabelle is the sister of Karla Perez (Karla), i.e., the person whose name and address were listed on a document found inside the victim's home.

Defendant and Annabelle were arrested during the traffic stop. Felix was arrested and interrogated the same evening. Over the course of two interviews (the second one was conducted two weeks later), Felix told multiple conflicting stories about Nagata and Karla arriving at his Planada residence sometime between the afternoon of July 14, 2019, and the afternoon of July 15, 2019. In one version of events, they had told Felix they were at a casino on the evening of July 14, i.e., the night of the shooting.

8.

A document found inside the Cadillac showed Nagata to be its registered owner as of July 12, 2019. His registered address was on East Alexander Avenue in the City of Merced.

*Further Investigation*

In late July, detectives obtained store surveillance video of the transaction documented on the Big 5 receipt found in the victim's home. The video showed Nagata, Karla, and a man named Fernando Luna shopping together on July 1, 2019. Portions of the video showed Nagata wearing a neck brace and being physically affectionate toward Karla. It also appeared to show him paying for the items listed on the receipt.

On July 29, 2019, Karla's then 17-year-old daughter, D.P., was hospitalized for alcohol intoxication and a stab wound sustained during an incident unrelated to this case. As the police had not yet located Nagata or Karla, detectives went to the hospital to question D.P. about the victim's death. D.P. was still intoxicated at the time of the interview, which lasted approximately three hours.

D.P. claimed to have killed the victim herself while under the influence of alcohol, cocaine, and marijuana. She referred to the victim by his first name, describing him as "a Mexican man that my mom was renting a room from." D.P. then added, "Her and her boyfriend were living there." She also remarked that her mother's boyfriend "wears a neck brace." Later in the interview, D.P. alleged that her mother (Karla), her aunt (Annabelle), and someone named "Martin" had all witnessed the victim's death. D.P. spoke disparagingly of Martin, referencing his "big ears" and saying that she hated him.

Although D.P. claimed to have shot the victim, her story conflicted with some of the physical evidence. The major discrepancy was in her account of the victim being shot "in the face" while inside his home and then going "into the road asking for help." But she did accurately describe the interior and exterior of the victim's residence, and she knew the shooting "happened, like, around 11:30 [p.m.] almost 11:31."

9.

On July 30, 2019, detectives obtained security camera footage from Casino Merced, located at 1459 Martin Luther King Jr. Way in the City of Merced. One video showed Nagata, Karla, Annabelle, and the victim in the casino on the night of the shooting. Nagata was wearing a neck brace. Exterior camera footage showed the group leaving together in defendant's Cadillac, with Karla behind the wheel, at approximately 11:10 p.m.

On July 31, 2019, detectives obtained surveillance video from a business located on West 15th Street, a few blocks east of Casino Merced. It showed a car resembling Nagata's Cadillac approaching the intersection of 15th and G Streets at approximately 11:21 p.m. on the night of the shooting. After pausing for traffic, the car turned left and proceeded northbound on G Street.

In early August, the police obtained surveillance video from an In-N-Out Burger located across the street from Casino Merced. It showed Nagata's Cadillac in the drive-thru lane on the night of the shooting from approximately 11:11 p.m. to 11:18 p.m. The license plate was clearly visible in the footage.

The police eventually received information that Nagata was in Tulare County. On August 10, 2019, Nagata and Karla were arrested together in the City of Lindsay.

***Charges and Trial Proceedings***

Nagata, Karla, Annabelle, and defendant were jointly charged by information for their alleged involvement in the victim's death. Nagata and Karla were accused of premeditated murder (§§ 187, 189; count 1). Karla was also charged as an accessory after the fact, as were defendant and Annabelle (§ 32; count 2). Nagata and Karla were further charged with attempted unlawful possession of ammunition (§§ 664, 30305; count 3). All counts included gang enhancement allegations pleaded pursuant to a former version of section 186.22, subdivision (b). Defendant was alleged to have suffered a prior strike conviction for purposes of the "Three Strikes" law. (§§ 667, subds. (b)–(i), 1170.12.)

10.

In January 2020, Nagata filed a motion under section 995 to set aside the information. Defendant joined in the motion and filed separate points and authorities regarding count 2. On February 18, 2020, the motion was granted as to the count 3 gang enhancement against Nagata but denied in all other respects.

Nagata also filed motions to be tried separately from his codefendants and to bifurcate the trial of the gang enhancements. Defendant joined in the motion to bifurcate. The trial court ordered severance of the case against Karla, but the motions were otherwise denied.

A jury trial commenced on February 25, 2020. On March 19, 2020, the trial court declared a mistrial due to the COVID-19 pandemic. All proceedings relevant to the mistrial are summarized in the Discussion, *post.*

Retrial began in September 2020 and continued into the following month. Renewed motions to bifurcate the gang enhancement allegations were denied. Nagata, Annabelle, and defendant were jointly tried before a single jury.

***Trial Evidence re: Counts 1 & 2***

A neighbor testified to seeing the victim outside his residence at approximately 10:30 p.m. on the night of the shooting. The victim was "throwing beer bottles or cans around" and yelling to someone inside the house "that he just wanted to go for a ride." He seemed "really upset." The witness did not know to whom he was speaking, but on prior occasions she had seen "two ladies and a gentleman that would usually let themselves into the home." The man wore a neck brace, and the trio had come and gone in a white Cadillac that "looked like an Eldorado."

Video evidence clearly showed Nagata, Karla, Annabelle, and the victim departing from Casino Merced in Nagata's Cadillac on the night of the shooting. The casino footage was edited to focus on the activity between 11:06 p.m. and 11:11 p.m. The evidence did not reveal when the group arrived at the casino, but a detective testified to Karla's cell phone data showing her phone was "in the area of Casino Merced" from

11.

11:00 p.m. to 11:19 p.m. The same witness testified that Annabelle's cell phone data showed her phone was "in the area of Casino Merced" from 9:53 p.m. to 11:30 p.m.

The In-N-Out Burger videos showed the Cadillac in the drive-thru lane from approximately 11:11 p.m. to 11:18 p.m. According to the People's theory, the Cadillac then drove on West 15th Street, passing a security camera at 11:21 p.m. as it approached the G Street intersection. It proceeded northbound on G, then east on 16th Street, and eventually made its way to Motel Drive. Between 11:21 and 11:22 p.m., the Cadillac traveled southeast on Motel Drive and entered the victim's neighborhood in the eastbound lane of Merced Avenue.

The People's trial exhibit No. 114 was a video consisting of seven minutes and 40 seconds of footage captured by the security camera on the 1200 block of Merced Avenue. It depicted the activity there from approximately 11:22 p.m. until just prior to 11:30 p.m. (See fn. 1, *ante*.) The exhibit was a recording of the recording. The detective who authenticated it explained there was a problem converting the video files from the homeowner's security system to a viewable format. He improvised a solution: "I … used my department-issued iPod with the Axon Video Capture to actually record the monitor while I played the video [on the homeowner's equipment] so I could actually capture what was on screen." The detective stopped recording when the video clock hit 23:28:47, which he explained was approximately one minute behind the actual time.[3]

Based on the Merced Avenue video and the In-N-Out Burger items found outside the victim's residence, the People argued Nagata, Karla, Annabelle, and the victim arrived back at the victim's home at approximately 11:22 p.m. The People theorized the victim had said or done something at the casino that made Nagata feel disrespected,

[3]The defense criticized the detective for failing to record the "three minutes" preceding the first 911 call. The three-minute estimate assumed the video clock was not approximately one minute slow. The detective conceded it was possible other cars had driven past the camera during the relevant time period. He also testified to having attempted to review the original video again in preparation for the preliminary hearing, whereupon he discovered that it had been erased.

which led to an argument at the house. Nagata was alleged to have shot the victim to death, but no theory was offered as to why the shooting occurred roughly two blocks away from the victim's home.

Witness M.A. was called to testify about waking up to the sound of people arguing on the night of the shooting. She was unsure of the time but again estimated it was "after midnight." She did not recall hearing any gunshots.

F.G. and A.D. both testified to having little memory of the incident. Their recorded interviews were played for the jury, as was F.G.'s 911 call. A police officer who had spoken to A.D. at the crime scene testified that he reported hearing someone say, prior to the shooting, "'Why are you mad?'" During the same conversation, A.D. claimed to have seen a 2005 or 2006 Cadillac CTS turn right onto Rose Avenue.

The 911 caller who lived on Rose Avenue, D.W., testified he was on his front porch when he heard the gunshots. He called 911 from inside his home approximately one minute later. The location of his garage obstructed his view such that he would not have seen a vehicle approaching from Merced Avenue before going into the house. There was also a period of approximately 45 to 60 seconds during which he would not have seen any vehicles that might have passed by his house. After calling 911 and returning to his porch, D.W. saw a police officer driving south on Rose Avenue toward Merced Avenue. He flagged down the officer and told him about the gunshots.

The People's theory was that Karla served as the getaway driver. Karla, Nagata, and Annabelle were alleged to have fled the scene in Nagata's Cadillac, passing multiple security cameras while heading northwest on Motel Drive at 11:30 p.m. However, the People's cell phone mapping expert testified the data for Karla's and Annabelle's phones showed both devices were one or two miles southwest of the crime scene at 11:30 p.m., "in the area of East Childs Avenue and Brantley Street." Upon further questioning, the witness explained the data was classified as having "a low confidence level," meaning the phones were more than 300 meters away from that location.

13.

Karla's daughter, D.P., testified pursuant to a grant of immunity after invoking her constitutional right against self-incrimination. She denied ever meeting the victim or discussing his murder with Karla or Nagata. D.P. also denied remembering what she had said during her hospital interview. A recording of the interview was played for the jury.

Through cross-examination of the lead detective, defense counsel suggested D.P. may have been the Hispanic female that F.G. and A.D. reported seeing prior to the shooting. The detective admitted to having considered this possibility, saying it was why he had asked D.P. what she wore that evening. During her interview, D.P. claimed to have been wearing pants and a black sweater. F.G. had described a person wearing shorts and a white tank top. The detective also testified that D.P.'s phone records "don't put her in that area" on July 14, 2019.[4]

Felix testified about the Cadillac being found at his home in Planada on Tuesday, July 16, 2019. Although he struggled with dates and times, the testimony indicated Karla and Nagata had shown up at his house on the night of the shooting (Sunday) or in the early hours of July 15, 2019 (Monday). In his words, "[T]hey just wanted a place to rest—to rest their head. And I said that they could stay in my room, as I was in my mom's room … with another friend of mine. And I was—I was busy, that I didn't have time to talk to them, you know, but that they could spend the night. [¶] They stayed the night. That was it." Felix admitted he was using methamphetamine on the dates in question.

Felix's testimony seemed to indicate Karla and Nagata had arrived alone, i.e., without Annabelle. There was no mention of Annabelle being there until Monday afternoon. Annabelle's cell phone data reportedly showed her device was in Planada at 5:19 a.m. Monday morning. Felix referred to a lunch conversation from that day during which plans were made for him, Nagata, Karla, and Annabelle to go to a casino. But then

---

[4]The testimony regarding D.P.'s phone records was hearsay, but it was elicited by Nagata without any objections from the other parties.

14.

defendant "happened to show up," and Felix "didn't want to go anymore because [he] did not want to be, like, a fifth wheel."[5]

For reasons not explained, Felix lent his car to Annabelle and defendant. The Cadillac was left at his house. Felix admitted to placing some type of covering over the Cadillac at Karla's request.

Karla and Nagata did not return to Felix's home. Felix did not see Annabelle or defendant again until Tuesday, when they finally brought his vehicle back and took possession of the Cadillac. Annabelle's cell phone data showed her device had traveled south on Monday night, registering with cell towers in Madera at 10:44 p.m. and in Tulare County at 11:59 p.m.

The People introduced an aerial map with a line depicting the route traveled by defendant and Annabelle after they left Felix's house on Tuesday, immediately prior to their arrest. The prosecutor argued defendant had intended to "dump" the Cadillac at an unknown location and would have done so but for the intervention of law enforcement. The alleged role of the Buick, occupied by Annabelle and the unidentified driver, was to provide transportation for defendant after he abandoned the Cadillac.

### Trial Evidence re: Gang Allegations

Nagata was alleged to have killed the victim after being publicly disrespected by him at Casino Merced. The preliminary facts of a public dispute and Nagata feeling disrespected were allegedly inferable from the Casino Merced videos. The victim had no known involvement with gangs, but Nagata was shown to be "a high-ranking Nuestra Familia criminal street gang member."

---

[5]Felix's testimony about not wanting to be a "fifth wheel" was the only evidence suggestive of a romantic relationship between defendant and Annabelle. The prosecutor's opening statement included an allegation that defendant was her "significant other," and parts of the record indicate this was in fact true, but the nature of their relationship was not otherwise mentioned or proven at trial.

15.

According to expert testimony, Nuestra Familia or "NF" is a criminal street gang with multiple levels of membership. Affiliates are commonly known as Northerners or Norteños, but those terms technically refer to a certain status or membership level. Nuestra Familia is both the name of the organization and the highest level of membership therein. The next level down is variously known as the "Northern Structure," "Nuestra Raza," and "Norteños Soldados" (abbreviated as "N-Sols"). Below that are the Norteños. As explained at trial, "Norteños are people that still are part of the cause or part of the Nuestra Familia, but they're lower level and haven't been selected or they haven't committed to being investigated [for advancement in the hierarchy]." Norteños may subdivide into smaller groups ("subsets") outside of the prison system, but "eventually it all leads up to Nuestra Familia."

Nuestra Familia's primary activities reportedly include murder, carjacking, witness intimidation, "major narcotic trafficking," and "[a]nything to do with violence." Murder, if committed against a gang rival, benefits NF by helping it maintain a reputation for violence and instilling fear and intimidation in others. The prosecution asked an expert witness if murdering someone not affiliated with gangs is also beneficial to NF. The expert replied, "Yes. If there was a reason for the homicide that they can articulate, then yes, it would benefit the gang as well." He then gave the example of an NF member reporting to his superiors that a victim "'totally disrespected me or disrespected the gang,'" in which case "that murder would be authorized." In other testimony, the expert noted the importance of respect in NF gang culture.

Two gang experts opined Nagata had attained the status of "Carnal" ("Brother") and was thus a "full-fledged member of the Nuestra Familia." According to one expert, "the NF has three categories of Carnals …[:] Cat-1, Cat-2, Cat-3." He opined Nagata was at least a "Cat-2 NF member," meaning he was involved in the overall management of the gang. The expert's opinions regarding Nagata's NF status were based on a recorded telephone conversation and photographs of him in the company of "Cat-3 NF

16.

members."**6**    The phone conversation was played for the jurors and explained to them through the testimony of a special agent with the FBI.

The phone call had been intercepted during a wiretapping operation conducted in November 2017. It was a conversation between Nagata and a higher ranking NF member. They discussed large-scale trafficking of methamphetamine and heroin, including a purchase that would require "about a 100 G's." The conversation shifted to the topic of postponing or cancelling previously made plans to kill two women who had stolen money from the organization. Also discussed was an NF investigation of a lower level member for possible removal from the gang. It was said they would "hit him" if the findings were negative, which the expert testified meant some degree of physical assault and "could mean death."

As further evidence of his gang membership, the People introduced photographs of Nagata's tattoos. The only tattoo directly related to NF was of the number 14, inked in large Roman numerals across his stomach and upper abdomen. According to expert testimony, references to this number are "predominant throughout the entire organization" because the 14th letter of the alphabet is N. The expert explained, "Anything that you can kind of put the, you know, emphasis on the N or the F could be used to represent the Nuestra Familia."

A tattoo of the word "murder" across Nagata's left forearm was deemed relevant because murder is one of Nuestra Familia's primary activities. This and several other tattoos were held admissible for the dual purpose of proving the gang enhancement allegations and showing "motive and identity of the shooter." Nagata's arguments for exclusion pursuant to Evidence Code section 352 were rejected.

---

**6**The People's briefing erroneously states the photographs were found inside the victim's home. The photos were located during a probation search at a different address in April 2018, nearly 15 months prior to the shooting. The jury was not told when or how photographs were obtained.

The prosecutor repeatedly displayed and referenced a tattoo on Nagata's chest of someone holding a gun to the back of a man's head, just behind the right ear. When the gang expert was asked about it, he noted Nagata also had tattoos of dollar signs and the word "money," opining they were collectively "indicative of gang behavior" but did not specifically pertain to Nuestra Familia. During closing argument, the prosecutor asked the jury to "remember the tattoo on … Nagata's chest that depicts someone being shot in the back of the head, the exact same manner in which [the victim] was killed."

The jury also saw a tattoo on Nagata's right hand that said, "get MAD," and another on his left hand that said "go BAD." A handgun was tattooed above the words on his left hand. One of the gang experts interpreted this as "indicating that when he gets mad, it'll go bad. So there's a propensity for violence if things go wrong." The trial court sustained an objection to this testimony and ordered it stricken, but the prosecutor was allowed to rephrase the question as follows: "So you're saying someone with a tattoo, based on your knowledge of criminal street gangs, like this would be signifying that if they get mad, they go bad?" The witness answered, "Right. That—that's what that would indicate to me, that that person would."

Photographs of Karla's tattoos were admitted to show her allegiance to NF. The relevant images were described as "one dot and then the four dots." A gang expert explained, "Typically they're on separate hands, but those are separated enough that it's pretty clear it's one dot/four dots for 14 to represent the Nuestra Familia." There was no gang evidence pertaining to Annabelle apart from her association with Karla, Nagata, and defendant.

Defendant's gang membership was proven by evidence of custodial statements made in May 2019, two months prior to the victim's death. A police officer testified he "admitted to being an active Norteño gang member and also stated that he wanted to house in … an active Norteño block at the Merced County Jail." The jury saw a redacted portion of defendant's recorded custodial interrogation following his arrest in this case,

18.

wherein he made implied admissions of active gang membership. The recording included references to a prior arrest in connection with a shooting. Another officer testified to personal knowledge of defendant's affiliation with a Norteño subset called the Merced Ghetto Boys. The same witness testified defendant had previously been arrested for possession of a firearm.

Photographs of defendant's tattoos were admitted into evidence. One said "Merced," another was described as "the Aztec numeral 12," and a third tattoo depicted "someone pointing a gun." A gang expert testified the Aztec numeral was symbolic of the Merced Ghetto Boys, which has some type of connection to 12th Street in Merced.

To establish a "pattern of criminal gang activity" (§ 186.22, former subd. (e)), the People relied on the prior convictions of two gang members, one of whom was Fernando Luna. The jury learned this was the same person seen on the Big 5 video shopping with Nagata and Karla on July 1, 2019. Luna was arrested on July 13, 2019, one day prior to the victim's murder, and later convicted of unlawful possession of a firearm. It was further revealed that defendant was with Luna at the time of Luna's arrest. The second predicate offender was Sergio Uriostegui, who had also been convicted of unlawful possession of a firearm.

### Verdicts and Sentencing

The jury began deliberating on Thursday, October 8, 2020, at approximately 3:33 p.m. It recessed for the day at 4:44 p.m. Deliberations resumed on Friday, lasting from 10:00 a.m. to 4:00 p.m. There was an afternoon request for a readback of Felix's testimony and that of the neighbor who testified to seeing the victim outside of his house on the night of the shooting. At 3:48 p.m., the jury submitted the following question: "If … Nagata is not found guilty can Anabelle … and [defendant] be found guilty of accessory after the fact?"[7]

---

[7]Counsel for defendant and Annabelle had both stated, during closing argument, that a guilty verdict against Nagata on count 1 was a prerequisite to finding either of them guilty as accessories after the fact. The trial court responded to the jury's question by referring it to

19.

The jury returned from a three-day weekend on Tuesday, October 13, 2020. Deliberations lasted from approximately 10:24 a.m. to 4:07 p.m. Late that afternoon, a request was submitted for "pictures of [defendant]'s tattoos." On Wednesday, October 14, 2020, the jury deliberated for approximately 4.5 hours before returning its verdicts.

Nagata was found guilty of first degree murder, but the gang allegations against him were rejected as not true. Defendant and Annabelle were both found guilty of being accessories after the fact. As to them, the gang enhancement allegations were found true. In a bifurcated proceeding, defendant admitted the truth of the prior strike allegation.

Defendant was sentenced to an aggregate prison term of seven years. The sentence was calculated using the middle term of two years for count 2, doubled because of the prior strike, plus three years for the gang enhancement.

## DISCUSSION

### I. Double Jeopardy Claim

#### A. Background

On February 25, 2020, jury selection began in defendant's first trial. Further proceedings were held on February 26, March 5–6, and March 10–11, during which time voir dire continued and motions in limine were heard. On March 12, amid further voir dire, the prosecutor made a record of her concerns "regarding the Coronavirus" and "the growing pandemic." The trial court responded with these remarks:

> "I share your concerns, and I know they're canceling all the conferences judges are going to even, like, retired judges conference because of everyone's concern about traveling and flying. [¶] I would note for the record we were up in the jury room with 165 jurors in very cramped quarters, certainly not a social distance apart, so I agree, but until the presiding judge would tell me not to go forward, at this point I'd have to go

CALCRIM No. 440. The pattern instruction explained the elements of section 32 in terms of aid provided to "the perpetrator," which arguably implied defendant could still be liable as an accessory even if someone other than Nagata (e.g., Karla) had killed the victim.

20.

forward, but I'll follow up with him again later this afternoon, and let him know that the DA's office had spoken to the Judicial Council."

Nagata stated for the record his general opposition to anything that would violate his "constitutional rights to a speedy trial."

On March 13, 2020, the trial court advised the parties "that the presiding judge did say that no other courts are suspending any proceedings so far in California." The court also noted it had conducted research and found cases, e.g., *People v. Tucker* (2011) 196 Cal.App.4th 1313, holding that "public health concerns do trump the right to a speedy trial." Nevertheless, it did not perceive good cause to order a trial continuance. Later in the day, a panel of 12 jurors and six alternates were sworn.

Trial resumed on March 17, 2020, with further hearings on motions in limine. The trial court opened the proceedings with these remarks:

> "I wanted to just let all parties know, um, I've been thinking more and more about the current health situation, and I did want to disclose yesterday I was on a conference call with [multiple people including the presiding judge, the district attorney and the public defender].… [¶] [And] there was a conversation from [the district attorney] regarding not the details of this case but just the DA's office's concern about the danger to the jurors and so on in having this trial, so I just want to disclose that.…

> "But I have been thinking about it further just because of all of the changes since Friday in the orders both nationally, state and locally, so I'll give you all a chance to respond, but I am thinking of declaring a mistrial on the grounds there are extraordinary circumstances that are outside the control of the Court that would be endangering the health of the public in this case. [¶] I would note that six Bay Area counties have stay-at-home orders at this time that people are to isolate themselves. There have been several courts, including Los Angeles and Contra Costa County, that have closed their courts and declared mistrials in even ongoing criminal cases. [¶] As far as I know, there's still no virus in Merced County, but only 18— according to the paper, 18 people have been tested, and they don't even have the results back from all of those.

> "There is a national emergency. There's been a state emergency declared. There's been a county emergency declared. There's been a city emergency declared. This is a pandemic by the World Health

21.

Organization.**[8]** The Federal Government is recommending no groups over ten—no public gatherings of over ten people, um, and I would note in this case, um, we can't practice social distancing for the jurors in this case.

> "It was suggested, [']Oh, you can have jurors sit outside the jury box and create the space,['] but it's a very small courtroom. Um, we have 14 regular jury seats. In this case I have six alternates. The well is taken up with the table for counsel. There's a small area in the well with the court reporter. If I put jurors in the audience and spaced them out, that's quite a distance from the witness stand as far as judging the witnesses and the credibility of the witnesses.

> "I don't think that would be a good idea, so just given all of these circumstances, we do have two jurors that are over 65, and then I don't know if the other jurors, who they have at home. It's just things have changed so much since last week regarding the situation, so that's why I'm considering it, but I'll give you some time until 1:30 if you want to address it further at that time."

The prosecutor responded with statements concerning the availability of two witnesses needed to authenticate the In-N-Out Burger videos. Their employer had reportedly sent a letter "saying they are not allowing their employees to travel." The trial court then made additional remarks:

> "Okay. So I realize at this point jeopardy is attached, but under *People v. Curry* in extreme circumstances outside of the Court's control— and that's at 2 Cal.3d 707, a 1970 case—that does constitute legal necessity. [¶] So I don't know. I'm just strongly considering it at this point. [¶] … [¶] … It's *Curry v. Superior Court*, 1970 case at 2 Cal.3d 707. It doesn't address this issue. It just talks about the fact that if it's extreme circumstances or physical things outside the Court's control, that could qualify as legal necessity; and, to me, the situation is something outside my control, um, and you're going to have 18 people coming risking their health and maybe their lives.

> "So that's—I'm very, very concerned about that. I was concerned last week but not as much since we've had all of these orders of people having to stay in their homes and, you know, don't go to restaurants or bars, and, you know, no groups over certain numbers. They keep getting

---

**8**"On March 11, [2020,] the World Health Organization declared COVID-19 a pandemic." (*Bullock v. Superior Court* (2020) 51 Cal.App.5th 134, 141.)

smaller. They start out not over 500, then not over 200, then not over 50, and now it's not over 10."

Later in the day, the prosecutor reported that a witness whose foundational testimony was needed in relation to the Merced Avenue video was "too high risk to come to court." When the afternoon session began, the trial court said, "[A]t this point I would not be declaring a mistrial because I think it would be double jeopardy. So I'm still very, very concerned, and I think it's foolish, but we don't have the orders, so …" (Original ellipsis.) The prosecutor then requested a continuance to April 6, 2020, due to the unavailability of witnesses. The trial court replied, "I know we can continue it for witnesses to be present, but I don't think we can go out a long time. That's defeating the whole purpose of a speedy trial. [¶] I mean, I would want some briefing on, you know, what—if you're expecting it would be reasonably available, then we would have to talk to the jurors as well, who's going to be available or not if we have to extend the ending date of the trial."

During a subsequent colloquy, Nagata said, "I would just object, too, to any form of mistrial, Your Honor …. [¶] … [¶] The jury is sworn in. We're ready to go. Both [sides] agreed that they're ready to go, and at this point, for the sake of a legal argument, if the Court was to entertain the idea of a mistrial through my objections—which you didn't say you were, but for the sake of legal argument—I would move the Court to rule for an acquittal barring the case from retrial under double jeopardy." Defendant's trial counsel joined in Nagata's arguments.

The jury was brought into the courtroom, and the judge asked if any of them were "65 or older." Two jurors who raised their hands were told they could be excused in light of "the advisory that you should stay home." Both declined the offer. Next, the trial court said, "Okay. And does anyone have any issues at all regarding that? Okay. I don't see any hands. I just wanted to double-check because things are moving so fast with different news coming out." The proceedings were adjourned for the day to allow the

23.

prosecutor time to determine witnesses' availability and potential grounds for a continuance.

On March 18, 2020, the trial court denied the People's request for a continuance due to their inability to estimate when the status of certain unavailable witnesses might change. The judge explained:

> "[A]t this point I just don't see—I think double jeopardy would attach. I don't see where I could just continue the case without a definite date. It is an abuse of discretion, but all of the cases that I've looked at, they have some certain date that they're going to continue, not to just indefinitely delay it. That's clearly violating the defendants' speedy trial rights, and that's where I have to balance, and all of the counties where I looked up the delay that has been granted by the Chief Justice, those delays were all trials that hadn't started yet.

> "As far as I know, every trial that's in progress is going forward. I know in Fresno that's the case. I had heard these rumors of some mistrials were declared, but we had people do research, and we could find no basis or that there's any truth, unless the People have something."

The trial moved forward with opening statements and testimony from nine prosecution witnesses.

On March 19, 2020, four additional witnesses testified during the morning session. At the beginning of the afternoon session, the following exchange took place between the trial court and the prosecutor:

> "[THE COURT:] [Y]ou have some information regarding COVID-19?

> "[PROSECUTOR]: Yes, Your Honor. Over the lunch break I contacted Officer Opinski to confirm his attendance in this trial tomorrow because he is a witness. At that time he informed me that he has been sick with a fever and is on his way to the ER to get tested for COVID-19 because another officer, Officer Jose Barajas, that he was in contact with, has tested positive for COVID-19.

> "Officer Opinski was in the Detectives Division on Monday and was with Detective Adrian and Detective Haygood. Detective Haygood has been in this courtroom throughout the proceedings. Detective Adrian

24.

testified today.  I do not know to the extent that Officer Prevostini was exposed to anything.

"The Detectives Division was sent home.  I told Detective Haygood and Detective Adrian not to return to the courtroom based on this—

"THE COURT:  Okay.

"[PROSECUTOR]:  —and so I do not think it's safe.  I think that the jurors need to be informed that they've been possibly exposed to this, um—

"THE COURT:  No, I agree.  I think at this point I would need to declare a mistrial because we've all been exposed.  I've been exposed.  I'm going to have to contact my healthcare provider to see if I should go into some type of self-isolation; and, as I mentioned earlier, I do have a husband who I just had lunch with who's 70 with underlying conditions, so it causes me great concern.

"This was—I was fearful of this all along, but it's just so uncertain what my obligation was under the law.

"[PROSECUTOR]:  And I was fearful, too.  I brought it up every day. I brought it to the Court's attention, and the presiding judge did not take this seriously, and this is the situation we're in now where people's health is endangered because of his decision.

"THE COURT:  So—well, I don't want to point fingers, but I can understand your frustration.  [¶] No, and I agree we'll have to let the jurors know.  I don't want to panic them, but I don't want them coming into the courtroom—"

Nagata responded as follows:

"I mean, just there's no medical records.  The way this case has been going, I mean, it's—to me, it's obviously in favor of us right now.  I just find it strange that all of a sudden that COVID-19 pops up.  There's no medical records that have been presented.  We're just going off of [the prosecutor's] word, so I object to any kind of mistrial.

"We have a jury sworn.  I want my trial heard before this jury that I already started with, and I move the Court that if you are going to rule a mistrial, that since I am objecting, that you rule this an acquittal and bar it from retrial because it would be double jeopardy and I submit on that."

Counsel for defendant and Annabelle joined in Nagata's arguments.  The trial court then made its ruling:

25.

"Well, at this time, given the circumstances, I am going to declare a mistrial. I believe that this is a case of extreme emergency. The Court is no longer available to hear this case at this point, um, and I don't want to expose anyone else to anything further.

"I thought of just continuing it, but even for a couple of weeks, who knows, and that's not fair for the jurors, I mean, so at this point, um, I'm going to declare it a mistrial. [¶] I'm not declaring it an acquittal…."

In April 2020, Nagata moved to dismiss the action based on double jeopardy principles. The motion was heard on May 14, 2020, at which time counsel for defendant and Annabelle orally joined in the motion on behalf of their clients. During the hearing, the prosecutor represented that Officer Opinski, i.e., the witness who was reportedly "sick with a fever and … on his way to the ER to get tested for COVID-19" when the mistrial was declared "was, in fact, tested" and the results came back negative.

The motion to dismiss was denied. In a lengthy oral ruling, the trial court noted the mistrial was declared two weeks after the Governor "had declared a state of emergency in California" and six days after "[President] Trump had also declared a national state of emergency." The judge emphasized "the basis for the Court declaring the mistrial was the state of emergency. It had nothing to do with whether witnesses were available or not, whether the DA would have been available or not." The trial court also cited its prior statements regarding the layout of the courtroom and inability to comply with social distancing guidelines.

The judge continued:

"So I just want to make it clear the basis for me at that point declaring the mistrial is concern for the health and safety of everyone. It was not based upon whether or not Officer Opinski did or did not have COVID-19. I did accept [the prosecutor's] representation that Officer Barajas had tested positive. He was a member of Merced Police Department, who was the investigating agency on this case and who had numerous witness officers that were going to testify. [¶] The Merced Police Department is housed in a small building next to courthouse, so I was concerned with contact between the officers.

26.

"We did have investigating Officer Haygood present throughout jury selection and in the courtroom. During jury selection we were basically packed like sardines in the jury assembly room and unable to avoid any contamination, but we kept going. We kept trying to keep going.

"Then on March 19th is when we received the information that there actually had been a positive test of someone here in Merced County—not only someone here in Merced County, but someone who directly works with witnesses in this trial. [¶] So it's on that basis that I felt it was a legal necessity that it was physical causes outside of the Court's control to go forward at this time.

"It could be the jurors would have been willing to go forward, but at that point I was not willing to have them come in the courtroom. That would not have made a difference to me. [¶] I was—I mean, you can just consider you have 17 jurors from all over the parts of the county. Each day one of those jurors are going back to their loved ones. The risk of exposure and causing the case to take off in this county with our limited medical resources was a real concern for the Court.

"I know [Nagata] said not one person in court had concerns, but the Court—I certainly had expressed concerns several times mainly because I do have relatives who are older, my husband and my mother, that I was concerned about exposing to the virus, and I was concerned for the staff of the court, as I said, and all of the parties. I was concerned about the defendants being exposed to the virus and taking it back to the jail. I mean, you can imagine in that environment the horrible situation that was possible.

"So that was the basis for me declaring the mistrial, and I don't think it was an abuse of my discretion. I think these are very unusual emergency situations. Um, it was with the duty of the Court to protect the health and safety of the public, and that was the basis of my declaring the mistrial.

"I did consider continuing the trial, but at that point it was so uncertain what was going to take place, and I was concerned if it would be continued with the jurors even remembering the testimony. I didn't see the practicality of continuing it. [¶] I didn't think further investigation was necessary because, again, it wasn't based upon Officer Opinski; it was based on the total situation that was occurring from day to day. So that was my reason for declaring the mistrial."

## B.    Appealability

"[S]ections 1016 and 1017 include, among those defenses that should be specifically pleaded, a claim of 'once in jeopardy.'" (*People v. Batts* (2003) 30 Cal.4th 660, 676.)  "Courts long have observed, however, that 'a claim of double jeopardy is most appropriately raised by way of a pretrial motion to dismiss the accusatory pleading or portion thereof allegedly barred by double jeopardy.'  [¶] … [A]lthough an affirmative plea of 'once in jeopardy' apparently was not entered, defendants' motions to dismiss, which were made on double jeopardy grounds and fully litigated by the parties in the trial court, nevertheless 'adequately covered this procedural requirement' and preserved the issue for review." (*Ibid*.)

## C.    Law and Analysis

"Article I, section 13, of the California Constitution declares that 'No person shall be twice put in jeopardy for the same offense.…'  Implementing this constitutional command, the decisions of [the California Supreme Court] have settled the now familiar rules that (1) jeopardy attaches when a defendant is placed on trial in a court of competent jurisdiction, on a valid accusatory pleading, before a jury duly impaneled and sworn, and (2) a discharge of that jury without a verdict is equivalent in law to an acquittal and bars a retrial, unless the defendant consented thereto or legal necessity required it." (*Curry v. Superior Court* (1970) 2 Cal.3d 707, 712.)

Our state Supreme Court has said the right not to be placed twice in jeopardy "is as sacred as the right to trial by jury." (*Larios v. Superior Court* (1979) 24 Cal.3d 324, 329.)  "California provides its citizens a greater degree of protection against double jeopardy than that provided by federal law by placing limitations on what constitutes 'legal necessity.'" (*Carrillo v. Superior Court* (2006) 145 Cal.App.4th 1511, 1525.)  In general, so long as the jury is "*not actually precluded* from rendering a verdict," the defendant must consent to a declared mistrial in order to be retried on the same charges. (*Larios*, at p. 330, citing *Curry v. Superior Court*, *supra*, 2 Cal.3d at p. 717; see *People v.*

28.

*Brandon* (1995) 40 Cal.App.4th 1172, 1175 [citing *Curry* for proposition that legal necessity exists "where physical causes beyond the control of the court … make it impossible to continue"].)

Legal necessity typically arises "(1) from an inability of the jury to agree or (2) from physical causes beyond the control of the court, such as death, illness, or absence of a judge or juror." (*Larios v. Superior Court*, *supra*, 24 Cal.3d at p. 330, citing *Curry v. Superior Court*, *supra*, 2 Cal.3d at pp. 713–714.)  The examples in the latter category are not exhaustive.  (See *Carrillo v. Superior Court*, *supra*, 145 Cal.App.4th at pp. 1526–1527 [additional examples]; *In re Carlos V.* (1997) 57 Cal.App.4th 522, 527 ["given the factual context of *Curry*, we do not read the court's list of types of 'legal necessity' to be exclusive"]; see also *People v. Saunders* (1993) 5 Cal.4th 580, 593 ["The standards for determining when a double jeopardy violation has occurred are not to be applied mechanically"].)

Trial courts are "vested with considerable discretion in ruling on mistrial motions." (*People v. Haskett* (1982) 30 Cal.3d 841, 854; accord, *People v. Schultz* (2020) 10 Cal.5th 623, 673.)  As noted in the People's briefing, at least one appellate court has suggested the de novo standard may apply to review of a sua sponte declaration of a mistrial based on legal necessity.  (See *Carrillo v. Superior Court*, *supra*, 145 Cal.App.4th at p. 1523 ["Although orders *denying* mistrials are reviewed for abuse of discretion, it does not appear our Supreme Court has applied this standard to orders *granting* mistrials"].)  We believe the ruling at issue is entitled to deference under the abuse of discretion standard. There may be instances where a finding of legal necessity is erroneous as a matter of law, but legal error can occur in all types of discretionary decisions.[9]  (See *People v. Superior Court* (*Humberto S.*) (2008) 43 Cal.4th 737, 746

[9]By way of example, the judge below declared herself "no longer available to hear this case" at the time of the mistrial.  Had this been the only reason for declaring a mistrial, and the evidence confirmed other judges were available to conduct the trial, the finding of necessity would have been erroneous as a matter of law given the fact section 1053 "permits the midtrial substitution of judges in criminal cases." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 427; cf.

["[W]hen a trial court's decision rests on an error of law, that decision is an abuse of discretion"]; *People v. Cooper* (2007) 148 Cal.App.4th 731, 742 ["A ruling resting on a demonstrable error of law constitutes an abuse of discretion"].)

The statement in *Carrillo* that "it does not appear our Supreme Court has applied [the abuse of discretion] standard to orders *granting* mistrials" overlooks the common scenario of juror deadlock. (*Carrillo v. Superior Court*, *supra*, 145 Cal.App.4th at p. 1523.) "Jury deadlock constitutes necessity for declaration of a mistrial and permits retrial of the defendant." (*People v. Halvorsen*, *supra*, 42 Cal.4th at p. 425.) "The determination whether there is a reasonable probability of agreement rests in the sound discretion of the trial court, based on consideration of all the factors before it." (*Id.* at p. 426, citing *People v. Rojas* (1975) 15 Cal.3d 540, 546.)

In our view, the question of whether a public health emergency necessitates a mistrial requires, as in other mistrial contexts, "'a nuanced, fact-based analysis,' which is best performed by the trial court." (*People v. Dunn* (2012) 205 Cal.App.4th 1086, 1094, quoting *People v. Chatman* (2006) 38 Cal.4th 344, 370.) Based on their arguments, the parties appear to agree. Defendant submits that the trial court's ruling, "while well intended, was impulsive and an abuse of its discretion."

Turning to the merits of the claim, we observe the trial court's finding of an emergency situation is uncontroverted. "On March 4, 2020, Governor Gavin Newsom declared a state of emergency as a result of the threat of COVID-19, and on March 19, 2020 [the day the trial court declared the mistrial], [he] issued an executive order directing all Californians not providing essential services to stay home. [Citation.] The order did not close the courts, which provide an essential service." (*E.P. v. Superior Court* (2020) 59 Cal.App.5th 52, 54–55, fn. omitted.)

---

*T.P.B. v. Superior Court* (1977) 66 Cal.App.3d 881, 883, 886 [mistrial legally necessary where juvenile court judge sitting as trier of fact "disqualified himself on the ground that he could not fairly and impartially consider the evidence"].)

"On March 23, 2020, Chief Justice Tani Cantil-Sakauye, in her capacity as Chairperson of the Judicial Council, issued an emergency statewide order suspending all jury trials and continuing them for a period of 60 days." (*Hernandez-Valenzuela v. Superior Court* (2022) 75 Cal.App.5th 1108, 1114.) "In so ordering, the Chief Justice explained: 'The [Centers for Disease Control and Prevention], the California Department of Public Health, and local county health departments have recommended increasingly stringent social distancing measures of at least six feet between people, and encouraged vulnerable individuals to avoid public spaces. [¶] Courts cannot comply with these health restrictions and continue to operate as they have in the past. Court proceedings require gatherings of court staff, litigants, attorneys, witnesses, and juries, well in excess of the numbers allowed for gathering under current executive and health orders. Many court facilities in California are ill-equipped to effectively allow the social distancing and other public health requirements required to protect people involved in court proceedings and prevent the further spread of COVID-19.'" (*Ibid.*)

With the benefit of hindsight, defendant argues the trial court should have ordered a continuance instead of a mistrial. The mistrial was declared on a Thursday, and, if only the judge had adjourned the proceedings until the following Monday, the Chief Justice's 60-day order might have resolved the issues that led the trial court to rule as it did. The trial would have been paused for three months by virtue of "a third statewide emergency order" issued April 29, 2020, which extended the 60-day suspension/continuance by an additional 30 days. (*Hernandez-Valenzuela v. Superior Court*, *supra*, 75 Cal.App.5th at p. 1115.) However, appellate courts determine the correctness of a ruling "'as of the time of its rendition, upon a record of matters which were before the trial court for its consideration.'" (*In re Zeth S.* (2003) 31 Cal.4th 396, 405; accord, *People v. Welch* (1999) 20 Cal.4th 701, 739.) The trial court had no way of knowing if or when the Chief Justice would take such unprecedented measures.

Defendant cites *Stanley v. Superior Court* (2020) 50 Cal.App.5th 164 for the proposition that "[h]ealth quarantines to prevent the spread of infectious diseases have long been recognized as good cause for continuing a trial date." (*Id.* at p. 169.) The key phrase is "continuing a trial *date*." The *Stanley* case and others cited in defendant's briefing, e.g., *People v. Tucker*, *supra*, 196 Cal.App.4th 1313 and *In re Venable* (1927) 86 Cal.App. 585, all involved pretrial continuances. Ordering a midtrial continuance in a jury trial is a materially distinct scenario, especially when the continuance will necessarily be one of indefinite duration. (Cf. *People v. Santamaria* (1991) 229 Cal.App.3d 269, 272 ["trial court committed reversible error when it adjourned jury deliberations for 11 days without good cause, despite both the availability of an alternative to interrupting the deliberations and the prejudice to appellant inherent in the timing and duration of the adjournment"]; *U.S. v. Hay* (9th Cir. 1997) 122 F.3d 1233, 1235–1236 ["we have never approved a jury separation even close to forty-eight days in a criminal case"].)

In recent cases, convicted appellants have argued that trial courts erred by *refusing* to declare mistrials following lengthy midtrial continuances attributable to the COVID-19 pandemic. Despite the possibility of jurors forgetting testimony and arguments—one of the risks cited by the trial court in this case—those claims have been resolved against the appealing parties. (E.g., *People v. Garcia* (2022) 83 Cal.App.5th 240, 243, 252 [103-day delay occurring after both parties had rested but prior to closing arguments held not to have violated appellant's constitutional rights], review granted on unrelated issue Jan. 11, 2023, S276858; *People v. Breceda* (2022) 76 Cal.App.5th 71, 95, 100 [same; 73-day delay occurring near the end of prosecution's case-in chief].) But again, the judge below had no way of knowing how future case law would turn out, and we must evaluate her decision based on the information available in March 2020.

Defendant contends "it does not appear that the court gave any measurable consideration to [his] right not to be twice placed in jeopardy for the same offense." He

32.

then qualifies the statement by focusing on the trial court's remarks immediately prior to declaring the mistrial, but either way the argument is unfounded. While the trial court may have experienced panic in the moments preceding its decision, the record shows it carefully considered the surrounding circumstances and competing factors over a period of several days. The decision was obviously not arrived at lightly, and it was rendered only after defendant's trial counsel had joined in Nagata's double jeopardy arguments.

Defendant also relies on *Bullock v. Superior Court*, *supra*, 51 Cal.App.5th 134, where the issue was whether the COVID-19 pandemic provided good cause to set a preliminary hearing beyond the 10-court-day deadline established by section 859b. There, the appealed decision was rendered without a reasoned explanation. (*Bullock*, at p. 154.) There was no "particularized showing of a nexus between the pandemic and the Superior Court's purported inability to conduct Petitioner's preliminary hearing in a timely fashion." (*Id.* at p. 140.)

In this case, the trial court made a record of its inability to comply with social distancing guidelines and mandates. Those statements were made on March 17, 2020, only six days prior to the Chief Justice ordering a 60-day suspension of all trial proceedings for essentially the same reasons. Based on the facts and circumstances known to the trial court at the time, we conclude it was not an abuse of discretion to declare a mistrial legally necessary on March 19, 2020, due to physical reasons beyond the court's control.

In his briefing, defendant alleges a mere "pause in the proceedings could have permitted the court staff to make the adjustments to continue the trial consistent with the Chief Justice's directive encouraging accommodations to protect the health of courthouse users along with the due process rights of litigants." He further contends "this is exactly what happened, as the trial was ultimately held six months later in the same courthouse with appropriate accommodations for staff and jurors." The argument is based on an advisory issued by the Chief Justice on March 20, 2020, not the 60-day order issued

March 23, 2020. Defendant also fails to mention that his first and second trials were conducted in different courtrooms. There is no evidence the dimensions and layout of those courtrooms were the same, nor evidence it was even possible to make the necessary "adjustments" to the first courtroom. Defendant has not affirmatively demonstrated reversible error.

## II. Sufficiency of the Evidence

Defendant claims the evidence did not show him to be an accessory within the meaning of section 32. He focuses on the prosecution's alleged failure to show his knowledge of the murder, and on the theory he and Annabelle intended to "dump" the Cadillac on the night of their arrest.

"'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence …. "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.] We do not reweigh evidence or reevaluate a witness's credibility.'" (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.)

"The crime of accessory consists of the following elements: (1) someone other than the accused, that is, a principal, must have committed a specific, completed felony; (2) the accused must have harbored, concealed, or aided the principal; (3) with knowledge that the principal committed the felony or has been charged or convicted of the felony; and (4) with the intent that the principal avoid or escape from arrest, trial,

34.

conviction, or punishment." (*People v. Plengsangtip* (2007) 148 Cal.App.4th 825, 836; accord, *People v. Nuckles* (2013) 56 Cal.4th 601, 607.) "Although many ""kind[s] of help"" may qualify as harboring, concealing, or aiding a principal under the statute, … the help provided must be in the nature of ""'overt or affirmative assistance.'""" (*People v. Partee* (2020) 8 Cal.5th 860, 868, quoting *Nuckles*, at p. 610.) In other words, conduct intended or designed "to lessen the chance that the perpetrators will be captured and held accountable for their crimes." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1168.) Regarding the elements of knowledge and intent, "the jury may consider 'such factors as [the defendant's] possible presence at the crime or other means of knowledge of its commission, as well as his companionship and relationship with the principal before and after the offense.'" (*Plengsangtip*, *supra*, at p. 837.)

Arguing he "had no connection whatsoever to the events on Merced Avenue," defendant claims there is insufficient evidence of his knowledge "that the Cadillac was used in a homicide." He overlooks the recorded statements of Karla's daughter, D.P. In addition to claiming responsibility for the shooting, D.P. identified four eyewitnesses: Nagata, Karla, Annabelle, and "Martin." Defendant's own trial counsel reasonably inferred that he was the "Martin" to whom D.P. was referring. Counsel remarked during closing argument, "She knows Martin as the ugly guy with big ears. Doesn't seem like she's too fond of him."

The fact D.P.'s confession to being the killer conflicted with the physical evidence did not necessarily mean she was lying about being present at the time of the shooting. "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*People v. Maury* (2003) 30 Cal.4th 342, 403.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever

35.

is there sufficient substantial evidence to support'" the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

As for the rendition of aid, defendant and the People are overly focused on the prosecutor's theory of a plan to "dump" the Cadillac. The prosecutor's more fundamental argument was, "The act that they did was driving away with the car." The fact defendant removed the Cadillac from Felix's property was significant in and of itself given Felix's value to law enforcement as a witness and the risk he posed to Nagata for that very reason. The jury could have reasonably concluded that moving the Cadillac to *any* location other than Felix's home was a form of aid because it would have decreased the chances of police ever questioning Felix and learning what he knew about Nagata's activities on the night of the shooting. (See *People v. Clark* (2011) 52 Cal.4th 856, 947 ["theories suggested by the prosecutor are not the sole theories the jury may consider in making its determination of guilt"]; *People v. Perez* (1992) 2 Cal.4th 1117, 1126 [same].)

Defendant's motive and intent to help Nagata avoid arrest and prosecution was inferable from their shared gang membership and Nagata's higher ranking status in NF. In addition to a common connection with Karla and Annabelle, they were also shown to be mutually acquainted with gang member Fernando Luna. The case against defendant was not strong, but the evidence is minimally sufficient to support his conviction.

## III.    Assembly Bill 333

Section 186.22 provides for enhanced punishment of gang-related crimes. A gang-related felony is one "committed for the benefit of, at the direction of, or in association with a criminal street gang." (§ 186.22, subd. (b)(1); see *People v. Albillar* (2010) 51 Cal.4th 47, 60.) The statute also requires "the specific intent to promote, further, or assist in criminal conduct by gang members." (§ 186.22, subd. (b)(1).)

At the time of the underlying events, a criminal street gang was defined as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the

criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (Former § 186.22, subd. (f), as amended by Stats. 2016, ch. 887, § 1; see Stats. 2013, ch. 508, § 1.)

A "pattern of criminal gang activity" was previously defined as "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of the [offenses listed in paragraphs (1) to (33)], provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons …." (Former § 186.22, subd. (e), 1st ¶, as amended by Stats. 2016, ch. 887, § 1; see Stats. 2013, ch. 508, § 1.)

In 2021, while this appeal was pending, the Legislature passed Assembly Bill 333, which took effect on January 1, 2022. (*People v. Tran* (2022) 13 Cal.5th 1169, 1206.) The legislation amended section 186.22 in several ways:

> "First, it narrowed the definition of a 'criminal street gang' to require that any gang be an 'ongoing, *organized* association or group of three or more persons.' [Citation.] Second, whereas section 186.22, former subdivision (f) required only that a gang's members 'individually *or* collectively engage in' a pattern of criminal activity in order to constitute a 'criminal street gang,' Assembly Bill 333 requires that any such pattern have been '*collectively* engage[d] in' by members of the gang. [Citation.] Third, Assembly Bill 333 also narrowed the definition of a 'pattern of criminal activity' by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang 'members,' as opposed to just 'persons'; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense. [Citation.] Fourth, Assembly Bill 333 narrowed what it means for an offense to have commonly benefitted a

street gang, requiring that any 'common benefit' be 'more than reputational.' [Citation.]" (*Tran*, at p. 1206.)

"Finally, Assembly Bill 333 added section 1109, which requires, if requested by the defendant, a gang enhancement charge to be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime. If the proceedings are bifurcated, the truth of the gang enhancement may be determined only after a trier of fact finds the defendant guilty of the underlying offense." (*People v. Tran*, *supra*, 13 Cal.5th at p. 1206.)

Assembly Bill 333's amendments to section 186.22 apply retroactively to cases not yet final as of the legislation's effective date. (*People v. Tran*, *supra*, 13 Cal.5th at pp. 1206–1207.) Therefore, defendant's gang enhancement must be reversed for insufficient proof of a pattern of criminal gang activity by Nuestra Familia, which needed to be shown to establish that it qualifies as a criminal street gang. (See *People v. Vasquez* (2016) 247 Cal.App.4th 909, 922 ["'The existence of a criminal street gang is unquestionably an element of [section 186.22]'"].) The predicate offenses committed by Fernando Luna and Sergio Uriostegui were not shown to have "commonly benefited a criminal street gang." (§ 186.22, subd. (e)(1).) "The proper remedy for this type of failure of proof—where newly required elements were 'never tried' to the jury—is to remand and give the People an opportunity to retry the affected charges." (*People v. E.H.* (2022) 75 Cal.App.5th 467, 480.)

Defendant argues section 1109 also applies retroactively. The People dispute this contention and alternatively argue harmless error. We address those issues below.

## IV.    Retroactivity of Section 1109

Section 3 states that no part of the Penal Code is retroactive "unless expressly so declared." However, in *In re Estrada* (1965) 63 Cal.2d 740, an amendment to a criminal statute was held to apply retroactively despite the Legislature's failure to expressly declare such an intent. (*Id.* at pp. 742–745.) The rationale for this outcome is now known as the "*Estrada* rule." (E.g., *People v. Frahs* (2020) 9 Cal.5th 618, 624.) "When

new legislation reduces the punishment for an offense, we presume that the legislation applies to all cases not yet final as of the legislation's effective date." (*People v. Esquivel* (2021) 11 Cal.5th 671, 673.)

The *Estrada* rule has been applied "to statutes that merely made a reduced punishment *possible*." (*People v. Frahs*, *supra*, 9 Cal.5th at p. 629.) In *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, the inference of retroactivity was extended to legislation that "ameliorated the possible punishment for a class of persons." (*Id*. at p. 308.) In *Frahs*, a pretrial diversion statute (§ 1001.36) was held to apply retroactively because it "offers a potentially ameliorative benefit for a class of individuals—namely, criminal defendants who suffer from a qualifying mental disorder." (*Frahs*, at p. 631.)

There is a split of authority on the retroactive application of section 1109. (Compare *People v. Burgos* (2022) 77 Cal.App.5th 550, 565-568, [holding § 1109 applies retroactively under *Estrada*], review granted July 13, 2022, S274743, and *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1128–1131 [same], with *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65 [holding § 1109 is not retroactive], review granted Oct. 12, 2022, S275341, *People v. Boukes* (2022) 83 Cal.App.5th 937, 948 [same], review granted Dec. 14, 2022, S277103, and *People v. Perez* (2022) 78 Cal.App.5th 192, 207 [same], review granted Aug. 17, 2022, S275090.) The issue is currently pending before the California Supreme Court in the lead case of *Burgos*.

This district has held that section 1109 applies retroactively in nonfinal cases such as this one. We reach the same conclusion here for the reasons fully stated in *People v. Ramos*, *supra*, 77 Cal.App.5th 1116 and *People v. Montano* (2022) 80 Cal.App.5th 82. The following is a summary of the analyses in those opinions.

Section 1109 contains no express declaration of retroactivity. However, there is a statement of legislative findings in an uncodified section of Assembly Bill 333. (Stats. 2021, ch. 699, § 2.) "An uncodified section is part of the statutory law." (*Carter v.*

*California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 925.) We thus consider these legislative declarations:

> "According to the Committee on Revision of the Penal Code's 2020 report: [¶] … [¶] Gang enhancement evidence can be unreliable and prejudicial to a jury because it is lumped into evidence of the underlying charges which further perpetuates unfair prejudice in juries and convictions of innocent people." (Stats. 2021, ch. 699, § 2, subd. (d)(6).)

> "California courts have long recognized how prejudicial gang evidence is. [Citation.] Studies suggest that allowing a jury to hear the kind of evidence that supports a gang enhancement before it has decided whether the defendant is guilty or not may lead to wrongful convictions. [Citations.] The mere specter of gang enhancements pressures defendants to accept unfavorable plea deals rather than risk a trial filled with prejudicial evidence and a substantially longer sentence." (Stats. 2021, ch. 699, § 2, subd. (e).)

> "Bifurcation of trials where gang evidence is alleged can help reduce its harmful and prejudicial impact." (Stats. 2021, ch. 699, § 2, subd. (f).)

In *Lara*, the California Supreme Court acknowledged "*Estrada* is not directly on point" if the statute in question "does not reduce the punishment for a crime." (*People v. Superior Court (Lara)*, *supra*, 4 Cal.5th at p. 303.) "But its rationale does apply" if the new legislation "reduces the possible punishment for a class of persons." (*Ibid.*) A possible reduction in the extent of punishment and the possibility of avoiding any punishment whatsoever are both "potentially ameliorative benefit[s]." (*People v. Frahs*, *supra*, 9 Cal.5th at p. 631.)

Section 1109 is intended to "reduce [the] harmful and prejudicial impact" of gang evidence (Stats. 2021, ch. 699, § 2, subd. (f)) and ultimately prevent wrongful convictions and unfair plea bargains (*id.*, subds. (d)(6), (e)). The "increased possibility of acquittal … necessarily reduces possible punishment." (*People v. Burgos*, *supra*, 77 Cal.App.5th at p. 567, review granted.) Likewise, "[b]y reducing the pressure to accept longer sentences, [section 1109] will necessarily reduce the degree of punishment for

many defendants charged with gang enhancements, even if they never have to invoke its prophylactic protections at trial." (*Ibid*.; see Stats. 2021, ch. 699, § 2, subd. (e).)

"[I]n order to rebut *Estrada*'s inference of retroactivity concerning ameliorative statutes, the Legislature must 'demonstrate its intention with sufficient clarity that a reviewing court can discern and effectuate it.'" (*People v. Frahs*, *supra*, 9 Cal.5th at p. 634.) Because it "provides a possible benefit to a class of criminal defendants and the statute does not contain an express savings clause that limits the [procedures] to prospective-only application, the specific question before us boils down to whether the Legislature 'clearly signal[ed] its intent' to overcome the *Estrada* inference that section [1109] applies retroactively to all cases not yet final on appeal." (*Frahs*, at pp. 631–632.) The People fail to identify any such indicators in Assembly Bill 333 or its legislative history. For all these reasons, we conclude section 1109 applies retroactively to nonfinal judgments.

## V.    Error and Prejudice

Defendant and his codefendants at trial all moved for bifurcation of the gang enhancement allegations. The motions were denied. In light of section 1109, those rulings were erroneous. We apply the "*Watson* test" (*People v. Watson* (1956) 46 Cal.2d 818) to determine whether the error was prejudicial. (*People v. Tran*, *supra*, 13 Cal.5th at pp. 1208–1209.)

"[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.'" (*People v. Beltran* (2013) 56 Cal.4th 935, 956.) "The Supreme Court has emphasized 'that a "probability" in this context does not mean more likely than not, but merely a

41.

*reasonable chance*, more than an *abstract possibility*.'" (*People v. Soojian* (2010) 190 Cal.App.4th 491, 519.) Conviction of a lesser included offense, or a mistrial due to a hung jury, is a more favorable result than being found guilty as charged. (*Id.* at pp. 520–521; see *People v. Walker* (2015) 237 Cal.App.4th 111, 118; *People v. Padilla* (2002) 103 Cal.App.4th 675, 679 [reversal based on reasonable probability jury would have found appellant "committed not a first degree murder but a second degree murder"].)

Section 1109 does not bar the admission of gang evidence, and its cross-admissibility for other purposes may result in jurors learning of a defendant's gang membership despite bifurcation. (See *People v. Tran*, *supra*, 13 Cal.5th at p. 1208 ["We have held that gang evidence, even if not admitted to prove a gang enhancement, may still be relevant and admissible to prove other facts related to a crime"]; *People v. Ramos*, *supra*, 77 Cal.App.5th at p. 1132.) "'Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.'" (*People v. Becerrada* (2017) 2 Cal.5th 1009, 1022.)

"But, 'even where gang membership is relevant, because it may have a highly inflammatory impact on the jury[,] trial courts should carefully scrutinize such evidence before admitting it.'" (*People v. Gomez* (2018) 6 Cal.5th 243, 294.) "Such evidence should not be admitted if only tangentially relevant" (*People v. Gurule* (2002) 28 Cal.4th 557, 653), or "where its sole relevance is to show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense" (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449; accord, *People v. Cardenas* (1982) 31 Cal.3d 897, 904–905). "Erroneous admission of gang-related evidence, particularly regarding criminal activities, has frequently been found to be reversible error, because of its inflammatory nature and tendency to imply criminal

disposition, or actual culpability." (*People v. Bojorquez* (2002) 104 Cal.App.4th 335, 345.)

The People argue defendant could not have been prejudiced by the failure to bifurcate the gang allegations because the gang evidence was "highly relevant to issues of motive, intent and the shooter's identity," and therefore cross-admissible in a trial of the charged offenses. We rejected this argument in *People v. Nagata* (Jan. 31, 2023, F082198) [nonpub. opn.] (*Nagata*), where the section 1109 error was held prejudicial as to Nagata given the reasonable probability of a more favorable outcome on all charges but for the admission of the various gang evidence. We hereby incorporate the *Nagata* opinion by reference and take judicial notice of the record in that appeal. (Evid. Code, §§ 452, subd. (d), 459, subd. (a); see, e.g., *People v. Bilbrey* (2018) 25 Cal.App.5th 764, 769, fn. 7 [taking judicial notice of the record in a related appeal on the court's own motion].)

Defendant's liability was closely tied to the question of Nagata's guilt on the charge of murder. Nagata's conviction on the murder count was not an absolute prerequisite to finding defendant guilty as an accessory after the fact (§ 972), but the prosecution's theory was that Nagata killed the victim. Taking into consideration the relative weakness of the case against defendant, the likelihood of a more favorable outcome for Nagata makes it reasonably probable, i.e., there is "'more than an *abstract possibility*'" (*People v. Soojian*, *supra*, 190 Cal.App.4th at p. 519), that defendant would have achieved a better result on count 2 in a bifurcated trial. (See *Zafiro v. United States* (1993) 506 U.S. 534, 539 [acknowledging "evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty. When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened"]; *People v. Kelly* (1986) 183 Cal.App.3d 1235, 1240 ["in a joint trial of a multiple number of defendants a codefendant may suffer 'associational prejudice'"].)

While it is likely some gang evidence would have been admitted against defendant to prove motive and intent, it is reasonably probable not all of it would have withstood scrutiny under Evidence Code section 352. As explained in our *Nagata* opinion, the gang evidence most likely to have been excluded in a bifurcated trial on the substantive offenses tended to show Nagata's and defendant's propensity for gun violence. This would include the evidence of defendant's prior arrests in connection with a shooting and the seizure of firearms, as well as his tattoo of "someone pointing a gun."

The length of the jury's deliberations, as well as its questions and requests to review evidence (including photographs of defendant's tattoos), further demonstrates the closeness of this case. (See *People v. Cardenas*, *supra*, 31 Cal.3d at p. 907; *People v. Pearch* (1991) 229 Cal.App.3d 1282, 1295.) For the reasons explained, it is reasonably probable defendant would have achieved a more favorable outcome but for the trial court's denial of the motions to bifurcate the gang enhancement allegations. Defendant is therefore entitled to a new trial on both the accessory charge and the related gang enhancement.

## DISPOSITION

The judgment is reversed.


PEÑA, J.

WE CONCUR:


FRANSON, Acting P. J.


SMITH, J.

44.